Wilson v. Merril Lynch & Co.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

––––––––––––––––

August Term, 2010

(Argued: February 25, 2011          Final Submission: July 8, 2011

Decided: November 14, 2011)

Docket No. 10-1528-cv

––––––––––––––––

COLIN WILSON,

*Plaintiff-Appellant*,

RONALD LEVY, MICHAEL BONDE,

*Plaintiffs*,

—v.—

MERRILL LYNCH & CO., INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,

*Defendants-Appellees.*[*]

––––––––––––––––

B e f o r e :

KEARSE, SACK, and KATZMANN, *Circuit Judges*.

––––––––––––––––

Appeal from a judgment of the United States District Court for the Southern District of

New York (Preska, *C.J.*) dismissing complaint for failure to state a claim. Plaintiff-Appellant

---

[*] The Clerk of Court is directed to amend the official caption as set forth above.

Colin Wilson, on behalf of purchasers of certain auction rate securities, asserts a claim for market manipulation under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. We hold that the conduct alleged to be manipulative was sufficiently disclosed to market participants so as to preclude plaintiff's claim. For the reasons stated below, the judgment of the district court is **AFFIRMED**.

––––––––––––––

DANIEL C. GIRARD (Jonathan K. Levine, Aaron M. Sheanin, *on the brief*), Girard Gibbs LLP, San Francisco, Cal., *for Plaintiff-Appellant*.

JAY KASNER (Scott D. Musoff, *on the brief*), Skadden, Arps, Slate, Meagher & Flom LLP, New York, N.Y., *for Defendants-Appellees*.

Jacob H. Stillman, Solicitor (Tracey A. Hardin, Senior Litigation Counsel, *of counsel*), *for amicus curiae Securities and Exchange Commission*.

David L. Schwarz (Mark C. Hansen, Kevin J. Miller, *of counsel*), Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C, *for amicus curiae The Anschutz Corporation*.

William F. Sullivan, Paul, Hastings, Janofsky & Walker LLP, Los Angeles, Cal. (Howard M. Privette, D. Scott Carlton, Paul, Hastings, Janofsky & Walker LLP, Los Angeles, Cal., Stephen B. Kinnaird, Paul, Hastings, Janofsky & Walker LLP, Washington, D.C., Barry Sher, Paul, Hastings, Janofsky & Walker LLP, New York, N.Y, Kevin M. Carroll, Associate General Counsel, The Securities Industry and Financial Markets Association, *of counsel*) *for amicus curiae The Securities Industry and Financial Markets Association*.

––––––––––––––

KATZMANN, *Circuit Judge*:

This case requires us to determine when a broker-dealer's disclosures of its market activities suffice to negate a claim that these activities are "manipulative" within the meaning of the securities laws.

Plaintiff-Appellant Colin Wilson appeals from a judgment of the United States District

2

Court for the Southern District of New York (Preska, *C.J.*) dismissing his complaint with prejudice. Wilson, a purchaser of auction rate securities ("ARS"), brings a purported class action lawsuit against Defendants-Appellees Merrill Lynch & Co., Inc. ("Merrill Lynch & Co.") and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") (collectively, "Merrill"). He alleges that Merrill engaged in a scheme to manipulate the ARS market in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(a) & (c) promulgated thereunder. Merrill moved to dismiss the complaint, and the district court granted that motion on several grounds, including that Merrill's disclosures of its auction practices preclude Wilson's claim that these practices were manipulative. On appeal, Wilson contends that this dismissal was in error. For the reasons set forth below, we conclude that Wilson's claim cannot proceed in light of Merrill's disclosures. Accordingly, we affirm the judgment of the district court.

## BACKGROUND

The following facts are drawn from the allegations in Wilson's First Amended Consolidated Class Action Complaint (the "complaint"), together with those "documents . . . incorporated in it by reference" and "matters of which judicial notice may be taken." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted).

This case arises from the collapse of the ARS market. ARS are debt or equity interests issued by various public and private entities and traded through periodic auctions. At times relevant to Wilson's claim, ARS were used by issuers as an alternative financing vehicle and were promoted to investors as a safe, liquid alternative to money market funds. The ARS

market, which began in the 1980s, was initially dominated by institutional investors. Eventually, however, unsophisticated investors entered the market. By February 2008, the ARS market exceeded $330 billion in value.

The periodic auctions held with respect to ARS would determine both the ownership of the securities as well as their "clearing rate," *i.e.*, the rate of interest that was paid on the securities until the next auction. At each auction, participants submitted orders to buy, sell, or hold ARS at particular interest rates or in particular quantities. When the number of shares subject to buy orders at a given rate met or exceeded the number of shares offered for sale at that rate, the auction would succeed, and the clearing rate would be set at the lowest interest rate at which all sell orders could be fulfilled. When the number of shares offered for sale exceeded the number of shares bid for purchase, the auction would fail, and the interest rate on the ARS would reset to a predetermined rate known as the "maximum rate." If the maximum rate were sufficiently high, it would ensure that the ARS remained liquid by attracting new buyers or prompting the issuer to refinance. If, on the other hand, the maximum rate were too low, then new buyers would not be attracted, and the auction failure, absent further intervention, would leave investors with illiquid securities.

Merrill Lynch, a broker-dealer registered with the Securities and Exchange Commission ('SEC"), is a wholly owned subsidiary of Merrill Lynch & Co., which is one of the world's leading financial firms. Merrill participated in the ARS market in various capacities. First, Merrill served as an underwriter for issuers who wished to raise cash though the use of ARS. Second, Merrill was paid by issuers to act as a dealer through which investors submitted auction orders, either directly or through intermediary brokerages designated as "remarketing agents" or

4

"distributing firms," for that issuer's ARS. Compl. ¶ 36. Merrill underwrote billions of dollars of ARS and served as sole, lead, co-lead, or joint lead auction dealer for over $24 billion of those securities.

On July 17, 2007, Wilson purchased from E*Trade, an online brokerage, $125,000 of ARS for which Merrill served as dealer. He continues to hold most of these securities, which are now illiquid.

A.    Merrill's Alleged Market Manipulation

On behalf of himself and all purchasers of ARS for which Merrill served as sole, lead, co-lead or joint lead auction dealer ("Merrill ARS") between March 25, 2003 and February 13, 2008, Wilson alleges that Merrill engaged in a scheme to manipulate the ARS market. Central to the alleged scheme is Merrill's practice of "support bid[ding]," or using its own capital to place bids in order to prevent the failure of auctions for which it served as sole or lead dealer. Wilson contends that pursuant to a tacit understanding among Merrill and ARS issuers, Merrill "followed a uniform policy of placing support bids if needed to prevent auction failures in every auction for which it was sole or lead auction dealer." *Id.* ¶ 46. Between January 3, 2006 and May 27, 2008, Merrill placed support bids in more than 5,800 auctions. Wilson claims that the support bids "masked the liquidity risks inherent in [Merrill] ARS" and created the false impression that the lack of auction failures reflected investor demand and that Merrill ARS could readily be liquidated if needed. *Id.* ¶¶ 50-51. Merrill's support bidding also permitted it to set clearing rates for auctions that would have failed absent its interventions. Wilson maintains that Merrill manipulated the clearing rates in order to reduce its own inventory of Merrill ARS, which it obtained through support bidding, and thereby sent a false signal to the market about the

5

price and liquidity of these securities.

According to the complaint, until the credit market deteriorated in the summer of 2007, Merrill invariably prevented ARS auctions from failing. Beginning in August and September 2007, Merrill declined to place support bids in at least 34 ARS issuances, thus allowing those auctions to fail. At that point, Merrill continued to support the ARS market while monitoring the industry for auction failures. On February 13, 2008, Merrill and all other major dealers withdrew their support from the ARS market. As a result, 87% of all ARS auctions failed, and investors like Wilson were left with illiquid securities.

Wilson's complaint sets forth a number of other ways in which Merrill allegedly misled ARS investors during this period:

- Merrill described its ARS as liquid and safe investments similar to money market funds and categorized these securities as "Other Cash" on clients' account statements. *Id.* ¶ 53.

- Although Merrill's research department was purportedly independent from Merrill's ARS trading desk, the trading desk shared material non-public information about Merrill's inventory of Merrill ARS with its research analysts. These research analysts, in turn, then issued research reports intended to sustain the "façade of liquidity" with respect to the Merrill ARS market and to reduce Merrill's inventory of these securities. *Id.* ¶ 51. In late August 2007, a managing director of the ARS trading desk demanded that a research report identifying some of the liquidity risks of Merrill ARS be retracted and succeeded in having that report be replaced by one that downplayed these risks. *Id.* ¶¶ 68-69.

- Through various sales incentives, Merrill encouraged its financial advisors to sell ARS to clients without disclosing Merrill's internal pessimism about the ARS market. *See id.* ¶¶ 91-98.

B.    Merrill's Disclosures

In resisting Wilson's manipulation claim, Merrill relies on several public disclosures of its ARS auction practices. The first such disclosure arose from an SEC investigation resulting in a settlement with several ARS broker-dealers, including Merrill. This investigation, which

6

began in 2004, concluded on May 31, 2006, when the SEC filed an Order Instituting

Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial

Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933

and Section 15(b) of the Securities Exchange Act of 1934 (the "2006 SEC Order"). The 2006

SEC Order stated that certain ARS broker-dealers violated the securities laws by intervening in

auctions without adequate disclosures. The Order noted that these interventions sometimes took

the form of dealers' bidding for their proprietary accounts in order to prevent auctions from

failing, and remarked that these interventions sometimes affected the securities' clearing rate.

The Order further specified that this conduct was improper because it was not adequately

disclosed, but clarified that the Order did "not prohibit broker-dealers from bidding for their

proprietary accounts when properly disclosed." App. 117 n.6. Pursuant to the Order's remedial

provisions, Merrill was required to pay a civil monetary penalty of $1,500,000 and to provide a

"written description of . . . material auction practices and procedures" to ARS issuers, customers

who held Merrill ARS, and first-time purchasers of Merrill ARS. *Id.* at 120-21. In addition, the

Order required Merrill to

> at all times make a description of its then-current material auction practices and
> procedures available to (1) all customers and broker-dealers who are participating
> through [Merrill Lynch] in an [ARS auction] on the portion of its website that is
> accessible to such customers and broker-dealers and is related to such auction and (2) the
> general public on another portion of its website accessible to the general public.

*Id.* at 122.

Pursuant to the 2006 SEC Order, Merrill posted on its website a document describing its

ARS practices and procedures. The disclosures in this document included the following

statements:

- "Auction procedures generally permit auction dealers like Merrill Lynch to buy

7

and sell, in their sole discretion, auction rate securities for their own account between auctions at any time." *Id.* at 102.

- "Merrill Lynch is permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or a seller, or both, and routinely does so in its sole discretion." *Id.*

- "Merrill Lynch may routinely place one or more bids[1] in an auction for its own account to acquire auction rate securities for its inventory, to prevent an auction failure . . . or an auction from clearing at a rate that Merrill Lynch believes does not reflect the market for the securities." *Id.* at 103.

- "Bids by Merrill Lynch or by those it may encourage to place bids are likely to affect the clearing rate, including preventing the clearing rate from being set at the maximum rate or otherwise causing bidders to receive a higher or lower rate than they might have received had Merrill Lynch not bid or not encouraged others to bid." *Id.*

- "Because of these practices, the fact that an auction clears successfully does not mean that an investment in the securities involves no significant liquidity or credit risk. Merrill Lynch is not obligated to continue to place such bids . . . in any particular auction to prevent an auction from failing or clearing at a rate Merrill Lynch believes does not reflect the market for the securities. Investors should not assume that Merrill Lynch will do so or that auction failures will not occur." *Id.*

- "Merrill Lynch may submit a bid in an auction to keep it from failing, but it is not obligated to do so. There may not always be enough bidders to prevent an auction from failing in the absence of Merrill Lynch bidding in the auction for its own account or encouraging others to bid. Therefore, auction failures are possible, especially if the issuer's credit were to deteriorate, if a market disruption were to occur or if, for any reason, Merrill Lynch were unable or unwilling to bid." *Id.* at 105.

Certain limited disclosures also appear in the prospectus for the ARS that Wilson purchased, which are shares of the BlackRock Muniholdings Fund, Inc. Auction Market Preferred Stock Series A. This prospectus noted that the auction dealers for the securities "may submit Orders" for their own accounts and that the lack of sufficient clearing bids could affect

---

[1] A "bid" refers to an auction order placed by holders or prospective investors to indicate their desire to continue to hold or acquire ARS at or above a specified interest rate.

8

the investment's liquidity.  *Id.* at 178, 182.[2]

While Wilson acknowledges the existence and public availability of these disclosures, he alleges that Merrill never provided him or other investors who purchased Merrill ARS from distributing firms such as E*Trade with disclosures of any kind.

C.      Procedural History

This lawsuit originated in two separate actions filed in March 2008 by purchasers of ARS.  In October 2008, the district court consolidated the actions and appointed as lead plaintiffs Gerald Wendel and Robert Berzin, two investors who purchased ARS directly from Merrill, and permitted them to file a consolidated amended complaint.  The district court also entered an order providing that if Merrill believed the complaint to be insufficient, Merrill should notify the plaintiffs of the perceived deficiencies by letter, and the plaintiffs would then have the choice either to stand on the present complaint or to file an amended complaint, with the understanding that no further amendments would be permitted.  Wendel and Berzin filed their consolidated complaint in December 2008.  Pursuant to the court's order, Merrill sent a letter regarding perceived deficiencies in that complaint, and the plaintiffs indicated their intention to adhere to the existing pleading.  In February 2009, Merrill moved to dismiss the complaint on several grounds, including that any market manipulation claim could not proceed in light of Merrill's disclosures.

Meanwhile, in August 2008, the SEC announced that it had reached a preliminary

---

[2] In the opinion below, the district court observed that the prospectus for "Series C" of the BlackRock MuniHoldings Fund Auction Market Preferred Stock, shares of which were purchased by another plaintiff in this action, specifically noted that broker-dealers may place bids for the purpose of preventing auction failures.  It is undisputed, however, that Wilson purchased shares from "Series A" of this investment, the prospectus for which does not contain a corresponding disclosure.

settlement with Merrill with respect to its investigation into the February 2008 collapse of the ARS market. This preliminary settlement was intended to resolve proposed charges alleging that Merrill made false representations to its customers that its ARS "were safe, highly liquid investments" and that Merrill failed to make "adequate disclosures that the liquidity of these securities was based on [its] supporting the auctions it managed when there was not enough demand." App. 192. As part of a global agreement with federal and state regulators, Merrill agreed to repurchase at par all ARS held by certain categories of Merrill clients. Lead plaintiffs Wendel and Berzin were eligible for and accepted this repurchase offer.

In April 2009, Merrill's counsel wrote to lead plaintiffs' counsel requesting that the lead plaintiffs voluntarily dismiss the complaint because their acceptance of the repurchase offer eliminated their standing to pursue manipulation claims on behalf of holders of Merrill ARS. Counsel for lead plaintiffs then requested leave to file a first amended consolidated complaint substituting as lead plaintiffs holders of Merrill ARS who were not eligible to participate in the repurchase offer. Merrill consented to the filing of that complaint, and the district court granted the request to withdraw Wendel and Berzin as lead plaintiffs and to appoint as new lead plaintiffs Wilson, Ronald Levy, and Michael Bonde, who purchased Merrill ARS from other broker-dealers and were therefore ineligible for the repurchase offer.[3]

On July 24, 2009, Merrill moved to dismiss this latest complaint, which asserted that Merrill Lynch engaged in manipulative conduct that violated Section 10(b) and Rule 10b-5(a) & (c) and that Merrill Lynch & Co. is liable under Section 20(a) of the Exchange Act because it

---

[3] In a June 10, 2009 order, the Judicial Panel on Multidistrict Litigation consolidated the instant action with three other ARS-related securities fraud actions brought against Merrill, transferred those actions to the Southern District of New York, and assigned this multidistrict litigation ("MDL") to Chief Judge Preska for coordinated or consolidated pretrial proceedings.

acted as a controlling person with respect to Merrill Lynch's alleged underlying violation. In an Opinion and Order dated March 31, 2010, the district court granted Merrill's motion and dismissed the complaint in its entirety. *See In re Merrill Lynch ARS Litig. ("Merrill")*, 704 F. Supp. 2d 378 (S.D.N.Y. 2010). Before discussing the plaintiffs' market manipulation claim, which was brought under subsections (a) and (c) of Rule 10b-5, the court noted that the plaintiffs had "expressly disclaimed any reliance on Rule 10b-5(b), which prohibits material misrepresentations or omissions." *Id.* at 388 n.6. The court then held that the market manipulation claim was deficient for several reasons, including that the plaintiffs failed to plead certain aspects of the alleged scheme with sufficient specificity, allege conduct that was "manipulative" within the meaning of the securities laws, or plead either direct reliance or reliance on an assumption of a market free of manipulation. *Id.* at 387-402. Because of the failure to adequately plead an underlying violation of the securities laws, the court dismissed the control person liability claim against Merrill Lynch & Co. *Id.* at 402. Finally, the court observed that the plaintiffs had already availed themselves of an opportunity to correct deficiencies that Merrill identified in the complaint, concluded that further amendment of the complaint would be futile, and accordingly dismissed the complaint with prejudice. *Id.* at 402-03.

Wilson timely appealed from the final judgment dismissing the complaint. Lead plaintiffs Bonde and Levy, whose securities were repurchased by their broker, Wells Fargo, in another regulatory settlement, did not appeal.

After hearing argument, this panel solicited the views of the SEC on several questions relevant to the disposition of this appeal. The SEC has since filed a letter brief, which we address in more detail below, which agreed with Wilson's position. We have also granted

11

requests for amicus participation on behalf of The Anschutz Corporation ("TAC")[4] and The

Securities Industry and Financial Markets Association ("SIFMA").

## DISCUSSION

We review *de novo* a district court's dismissal of a complaint for failure to state a claim

upon which relief can be granted, "accepting all factual allegations in the complaint as true, and

drawing all reasonable inferences in the plaintiff's favor." *Holmes v. Grubman*, 568 F.3d 329,

335 (2d Cir. 2009) (internal quotation marks omitted). "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks

omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* "Th[is] plausibility standard . . . asks for more than a sheer possibility that a

defendant has acted unlawfully." *Id.*

A plaintiff alleging any form of securities fraud must also meet the pleading requirements

of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109

Stat.737 (codified in scattered sections of 15 U.S.C.). *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar

Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing 15 U.S.C. § 78u-4(b)(3)(A)). If the plaintiff

alleges that the defendant

> (A)  made an untrue statement of a material fact; or
>
> (B)  omitted to state a material fact necessary in order to make the statements
>      made, in the light of the circumstances in which they were made, not
>      misleading;

---

[4] TAC, a plaintiff in another lawsuit that is part of the MDL from which this appeal
originates, is an institutional investor that holds Merrill ARS.

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

A.     Market Manipulation

1.     Legal Standards

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).[5]

"Section 10(b), in proscribing the use of a 'manipulative or deceptive device or contrivance,' prohibits not only material misstatements but also manipulative acts."  *ATSI*, 493

---

[5] Rule 10b-5, in turn, states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a)     To employ any device, scheme, or artifice to defraud,

(b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

F.3d at 99 (citation omitted); *see also United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008) (observing that the "broad language" of Section 10(b), "on its face, extends to manipulation of all kinds, whether by making false statements or otherwise"). Here, Wilson's claim against Merrill is based exclusively on Merrill's alleged manipulation of the ARS market; Wilson has expressly disclaimed reliance on Rule 10b-5(b), which addresses liability for material misstatements or omissions. But "[b]ecause a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b)." *ATSI*, 493 F.3d at 101; *see* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

> Market manipulation requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange.

*ATSI*, 493 F.3d at 101 (citations omitted). Where scienter is an element of a plaintiff's claim, the PSLRA also requires the plaintiff, "with respect to each act or omission alleged to violate [the securities laws]," to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A). Merrill contends that Wilson's pleading is deficient as to several of the required elements of a market manipulation claim. We turn first to the threshold question of whether Wilson has alleged "manipulative acts."

The Supreme Court has observed that the word "manipulative" is "virtually a term of art when used in connection with securities markets." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (internal quotation marks omitted). "The term refers generally to practices, such as

14

wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity," *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977), and "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities," *Ernst & Ernst*, 425 U.S. at 199.

"[C]ase law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security." *ATSI*, 493 F.3d at 100. "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999). "In identifying activity that is outside the 'natural interplay of supply and demand,' courts generally ask whether a transaction sends a false pricing signal to the market." *ATSI*, 493 F.3d at 100.

In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure. *See Santa Fe Indus.*, 430 U.S. at 477 ("[N]ondisclosure is usually essential to the success of a manipulative scheme."); *see also ATSI*, 493 F.3d at 101; *Schreiber v. Burlington N., Inc.,* 472 U.S. 1, 7-8 (1985). As the district court here put it, "[t]he market is not misled when a transaction's terms are fully disclosed." *Merrill*, 704 F. Supp. 2d at 390. In this regard, the prohibition of "manipulative" practices in Section 10(b) is "fully consistent with the fundamental purpose of the [Exchange] Act 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor.'" *Santa Fe Indus.*, 430 U.S. at 477 (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972)).

While our precedents contain little discussion of when disclosures are sufficient to negate a claim that a certain market practice is manipulative, courts have on many occasions addressed

15

the adequacy of disclosures in the context of other provisions of the Exchange Act. For example, in determining under the "bespeaks caution" doctrine whether cautionary language may protect an issuer from liability for alleged misrepresentations in a stock offering, we have noted that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *accord Slayton v. Am. Express Co.*, 604 F.3d 758, 770 (2d Cir. 2010) ("[C]autionary language that is misleading in light of historical fact cannot be meaningful . . . ."); *see also Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) (highlighting "the critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge the event *will* occur"); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."). More generally, "[t]he law is well settled . . . that so-called 'half-truths' — literally true statements that create a materially misleading impression — will support claims for securities fraud." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011); *see also Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 249 (2d Cir. 1973) ("The[ securities] laws are founded on the principle that full and fair disclosure of all material facts must be made to investors so that they may have the benefit of the facts in making their investment decisions."). Similarly, in the context of liability under Section 10(b) for alleged misstatements or omissions, dismissal on the basis that the misstatements or omissions are not material is unwarranted "unless the[se misstatements or omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

16

At the same time, we have made clear that there are limitations on what securities market participants are required to disclose in order to avoid liability. "Disclosure is not a rite of confession or exercise of common law pleading." *In re Morgan Stanley Info Fund Sec. Litig. ("MSIF")*, 592 F.3d 347, 365 (2d Cir. 2010) (internal quotation marks omitted). "'What is required is the disclosure of material objective factual matters.'" *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (quoting *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5-6 (2d Cir. 1983)). Moreover, in discussing when the disclosure of the intention to make a tender offer is required by the securities laws, we have held that "[i]t would be as serious an infringement of [SEC] regulations to overstate the definiteness of the plans as to understate them." *Elec. Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969).

2.    Wilson's Claim

The district court held that the publicly disclosed information about Merrill's bidding practices was sufficient to defeat the allegation that these practices sent a false pricing signal to the market. *Merrill*, 704 F. Supp. 2d at 391-93. On appeal, Wilson argues that Merrill's disclosures were incomplete or misleading and, as such, do not preclude his manipulation claim. Merrill's disclosures, according to Wilson, omitted the following material facts:

> First, Merrill did not periodically or even "routinely" submit support to prevent individual auctions from failing. Instead, it did so as a matter of course in every single auction in which it was the sole or lead auction dealer under a tacit or express understanding with the issuers of [Merrill] ARS that Merrill would systematically support the auction rate securities market. Second, Merrill knew with certainty that there was insufficient investor demand, and that the market would fail unless it placed support bids. Third, Merrill bid not out of a desire to increase its own inventory, but rather to create a false impression of demand. Fourth, Merrill's bids were not designed to "reflect the market" for [Merrill] ARS, but to sustain it, as Merrill increased interest rates to attract buyers, in a desperate attempt to keep the market afloat for as long as possible.

17

Wilson Br. at 28-29 (citations omitted).[6]  For the following reasons, we find no error in the

district court's conclusion that Merrill's disclosures of its support bidding practices sufficed to

preclude Wilson's claim that these practices were manipulative.

As an initial matter, there can be no dispute that the general phenomenon of ARS dealers

placing bids to prevent failed auctions (*i.e.*, "support bidding") was publicly disclosed by the

time that Wilson purchased his ARS in July 2007.  The 2006 SEC Order, for example, noted that

certain ARS dealers had "submitted bids to ensure that all of the securities would be purchased

to avoid failed auctions and thereby, in certain instances, affected the clearing rate."  App. 117.

The Order faulted the dealers for inadequate disclosures of their bidding practices, but made

clear that dealers were permitted to bid for their own accounts as long as that bidding was

properly disclosed.

Pursuant to the 2006 SEC Order, Merrill posted on its website a document disclosing its

then-current auction bidding practices.  As noted above, this document included the disclosures

_____

[6] Wilson contends also that the district court overlooked Merrill's failure to disclose the following material facts:

> (1) the market for [Merrill] ARS was under increasing stress; (2) Merrill needed to provide greater levels of support to prevent auction failures, while its balance sheet was weakening, thereby increasing the likelihood that Merrill would exit the market; (3) Merrill anticipated further liquidity problems and recognized that the [Merrill] ARS market was "collapsing" and that issuers "would be best served by exiting the market"; (4) Merrill's support for the auctions depended upon undisclosed inventory limits on its [Merrill] ARS holdings; (5) Merrill's ARS Trading Desk co-opted its purportedly independent Research Department to endorse [Merrill] ARS, while recognizing that publication of frank assessments would "SINGLE HANDEDLY UNDERMINE THE AUCTION MARKET"; and (6) Merrill allowed the Research Department access to material, non-public information about its [Merrill] ARS inventory and plans to reduce that inventory in violation of the prohibitions detailed in its Policy & Procedures Manual and its website disclosure.

Wilson Br. at 29 (citations and some brackets omitted).

that (1) Merrill "is permitted, but not obligated, to submit orders in auctions for its own account"; (2) Merrill "routinely" places such orders "in its sole discretion"; (3) Merrill "may routinely place one or more bids in an auction for its own account" for several purposes, including to "prevent an auction failure"; (4) due to the possibility that Merrill would place such bids for this purpose, "the fact that an auction clears successfully does not mean that an investment in the securities involves no significant liquidity or credit risk"; and (5) "in the absence of Merrill . . . bidding in the auction for its own account or encouraging others to bid," there might not be sufficient demand to prevent auction failure. *Id.* at 102-05. These disclosures revealed, at the very least, the possibility that Merrill would place support bids in some auctions that it managed and that in the absence of these bids, some of these auctions might fail.

Wilson nonetheless contends that these disclosures were incomplete and misleading because they failed to apprise investors of the extent to which the market for Merrill ARS was dependent on Merrill's continued placement of support bids. Wilson's argument in this regard has two related facets: first, that Merrill understated the likelihood that it would place support bids; and second, that Merrill should have made clear that in the absence of its placement of such bids, the market for Merrill ARS was certain to collapse. This argument, we conclude, goes beyond what the well-pleaded allegations in Wilson's complaint can sustain.

As noted, Wilson's brief on appeal faults Merrill for not disclosing its intention to place support bids in "every single auction in which it was the sole or lead auction dealer." Wilson Br. at 28. That formulation, however, is difficult to reconcile with what is alleged in Wilson's complaint. To be sure, the complaint does contain the allegation that Merrill had a policy of placing support bids in "every auction" for Merrill ARS, Compl. ¶ 5, and also sets forth certain other averments suggesting that Merrill's practice of support bidding was unqualified, *e.g.*, *id.*

19

¶ 49 ("Merrill failed to disclose to investors that it invariably placed support bids in every auction for which it was the sole or lead auction dealer during the Class Period to prevent auction failures."). However, other factual allegations regarding Merrill's support bidding practices are phrased in terms that limit the circumstances in which Merrill was said to have engaged in this alleged activity. *See, e.g.*, *id.* ¶ 44 ("Throughout the Class Period, Merrill used its own capital to *routinely* place 'support bids' in every auction in which it served as the sole auction dealer or as the lead auction dealer in multi-dealer auctions." (emphasis added)); *id.* ¶ 46 ("Until August 2007, Merrill followed a uniform policy of placing support bids *if needed to prevent auction failures* in every auction for which it was sole or lead auction dealer." (emphasis added)); *id.* ¶ 58 ("during the Class Period, Merrill never disclosed that it maintained a policy of placing support bids *as needed to suppress auction failures* in every auction for which it served as sole or lead auction dealer" (emphasis added)). The inconsistencies in the complaint as to this critical allegation undermine the force of Wilson's contention that the corresponding disclosures were misleading.

Even if we were to construe the complaint as attempting to plead that Merrill, at least for a time, placed support bids in every single auction for Merrill ARS, we do not see how that allegation can be actionable given Merrill's disclosure that it "may routinely" place such bids. Merrill's statement that it "may routinely" place support bids is not inconsistent with the possibility that it would place such bids in every Merrill ARS auction that took place over a particular period. While Wilson reads the word "may" as speaking to the likelihood that Merrill would place support bids, an investor could more easily understand the word as disclosing merely that Merrill was permitted, but not required, to place bids for its own account to prevent an auction from failing. *See Webster's Third New International Dictionary* 1396 (2002)

20

(defining "may" to mean, *inter alia*, "have permission to," "have liberty to," and "be in some degree likely to"). And the word "routinely," which has been defined to mean "of a commonplace or repetitious character," *id.* at 1981, is consistent with the frequency of intervention that Wilson alleges. Far from asserting that Merrill has invariably and at all times placed such bids, the complaint acknowledges that "Merrill allowed a limited number of [Merrill] ARS auctions to fail in August 2007," Compl. ¶ 68, and that Merrill entirely withdrew its support of the ARS market in February 2008, *id.* ¶ 103. If Merrill's intention was, as Wilson alleges, to place support bids in every single auction unless it decided to let certain auctions fail or withdraw from the market altogether, we think that Merrill fairly disclosed that intention by stating that it "may routinely" place such bids.

Similarly, the complaint fails to allege, as Wilson asserts on appeal, that Merrill "knew with certainty" that each Merrill ARS auction would fail if Merrill did not intervene. While the complaint recites that between January 3, 2006 and May 27, 2008, Merrill placed support bids to prevent more than 5,800 auctions from failing, *id.* ¶ 47, the complaint does not provide the total number of auctions of Merrill ARS that were held over that period so as to enable an inference to be drawn about the dependence of these auctions on support bidding. And although the complaint's allegation that 87% of ARS auctions failed following the withdrawal of support by Merrill and other ARS dealers certainly suggests that support bidding was significant to the overall viability of the ARS market, the corollary that 13% of auctions nonetheless succeeded is inconsistent with Merrill's alleged knowledge with "certainty" that support bids were necessary for the success of every auction. More generally, to the extent that Wilson's complaint includes allegations that Merrill knew that the ARS market was "unsustainable," that knowledge is not alleged to have arisen until "the fall of 2007," *id.* ¶ 135, *i.e.*, after Wilson had purchased his ARS

21

in July 2007, the credit market had deteriorated, and Merrill and other dealers had allowed some ARS auctions to fail. Taken together, these allegations do not support the inference that Merrill knew, *at the time of Wilson's purchase*, that the ARS market was certain to fail in the absence of its intervention.[7]

We address next Merrill's alleged conduct in allowing the ARS trading desk to pressure the purportedly independent research department into publishing reports that downplayed the risks of ARS. Wilson does not claim that he relied on these research reports, nor does he assert that he was aware of any other statement attributable to Merrill regarding ARS at the time of his purchase. However, even in the absence of Wilson's direct reliance on Merrill's communications to ARS investors, these reports would lend support to his claim to the extent that they masked the dependence of the market on Merrill's continued interventions. *Cf. Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (declining to affirm dismissal of Section 10(b) misrepresentation claim on basis that truthful information had been disclosed to the market where the record did not indicate "whether those disclosures were conveyed with sufficient

_____

[7] Our discussion of the timing of Wilson's purchase focuses on its relevance to the "manipulative acts" element of his market manipulation claim, or, in other words, whether Wilson has alleged that Merrill's bidding activity sent a false signal to the Merrill ARS market at times relevant to his purchase. As noted, the determination of whether certain market activities are "manipulative" within the meaning of the securities laws requires us to consider whether these activities were fully disclosed to the market. This assessment of the adequacy of disclosure, in turn, must look to what was known by the market as of the time of the alleged manipulative acts. *Cf. ATSI*, 493 F.3d at 101-02 (internal quotation marks omitted) (stating that market manipulation claims, like other fraud claims, must be pleaded with particularity, which requires that the complaint plead "to the extent possible, . . . when the manipulative acts were performed" (internal quotation marks omitted)). Here, we need consider only the alleged manipulative acts that took place before Wilson's July 2007 purchase of ARS, because Merrill's subsequent activities were not "in connection with [his] purchase" of Merrill ARS. *Id.* at 101. We recognize also that the timing of Wilson's purchase may potentially be relevant to other elements of his market manipulation claim, including whether Wilson can plead reliance, scienter, or damages, but we have no occasion to discuss those issues in this opinion.

'intensity and credibility' as to dispel the false impression created by [the] alleged misrepresentations"). But because all of Wilson's allegations regarding the research reports pertain to matters taking place in August 2007 and thereafter, these reports could not possibly have sent a false signal to the market as of Wilson's July 2007 purchase of securities. In any event, as the district court noted, some of these research reports actually disclosed that ARS dealers would typically enhance liquidity by engaging in "market support activities," although the dealers were not required to do so. *See Merrill*, 704 F. Supp. 2d at 401.

Wilson's manipulation claim also appears to rest on his allegation that Merrill failed to disclose its true purposes for intervening in the auctions that it managed. Wilson avers that Merrill placed bids in its auctions not to reflect the market for the ARS or to increase its holdings of ARS, but rather to create a false impression of demand, to sustain the market as long as possible, and to meet certain limits on its own inventory. Relatedly, he faults Merrill for failing to disclose its internal assessment that the ARS market was collapsing — although we note that Wilson does not claim that Merrill had come to this view by the time he purchased his securities in July 2007. We do not think these are the sorts of omissions that can sustain Wilson's claim that Merrill's support bidding was manipulative. Here, Merrill disclosed that it would "routinely" bid on its own account and that it "may routinely" place such bids for the purpose of preventing auctions from failing, and it warned investors that its bidding might affect the clearing rate or the success of particular auctions. These disclosures suffice, in the circumstances of this case and at times relevant to Wilson's allegations, to prevent Merrill's alleged policy of support bidding from sending a false signal to the ARS market. Given Merrill's statements that it believed itself to be at liberty to engage in this market activity and its discussion of the possible consequences of this activity on the price and liquidity of ARS, its

23

alleged motivations for placing support bids and its internal assessment of the viability of the

ARS market do not render the disclosed practices manipulative.[8]

Finally, we note that our conclusion that Merrill's disclosures preclude Wilson's market

manipulation claim is fully consistent with, if not compelled by, this court's decision in *Ashland*

*Inc. v. Morgan Stanley & Co.*, 652 F.3d 333 (2d Cir. 2011). There, the plaintiffs (collectively,

"Ashland") — a global chemical company that is a sophisticated investor — purchased student

loan-backed ARS ("SLARS") brokered by Morgan Stanley based on the allegedly misleading

advice of a Morgan Stanley financial advisor. Ashland claimed that Morgan Stanley materially

misrepresented the liquidity of the SLARS that Ashland purchased, thus violating Section 10(b)

of the Exchange Act and Rule 10b-5. In particular, Ashland alleged that the financial advisor

falsely assured it that SLARS were "safe, liquid instruments" and downplayed the possibility of

auction failures. *Id.* at 335-36 (internal quotation mark omitted). Ashland also maintained that

Morgan Stanley failed to disclose, *inter alia*, "how often demand failed to meet supply in . . .

auctions, and consequently, how often it had to step in to purchase the [securities]," *id.* at 336,

and that "Morgan Stanley's 'market making' activities were essential to avoiding total

illiquidity" of these securities, *Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 459

(S.D.N.Y. 2010). Morgan Stanley moved to dismiss in part based on website disclosures

substantially similar to Merrill's. These disclosures revealed that "Morgan Stanley routinely

placed bids in its own auctions, in part to prevent auctions from failing," that it did so in its

discretion, and that it was not obligated to intervene to ensure each auction's success. 652 F.3d

---

[8] For similar reasons, Wilson's allegations regarding Merrill's internal efforts to promote ARS sales fail to give rise to a claim of market manipulation, as they do not support the inference that Wilson's financial advisors made false or misleading statements to market participants in relation to the activity that Wilson claims is manipulative.

at 338. The district court dismissed Ashland's complaint in its entirety.

Our court affirmed the dismissal of Ashland's Section 10(b) claim on the ground that the SEC-mandated statement "explicitly disclosed the very liquidity risks about which appellants claim to have been misled." *Id.* Even though Ashland alleged that it first purchased SLARS prior to receiving a copy of this disclosure, the panel charged Ashland with knowledge of the contents of that disclosure because "the statement was also available online, and appellants could have easily discovered it through minimal diligence." *Id.* at 338 n.4.

There are, of course, certain differences between this case and *Ashland*. For example, while Ashland was a sophisticated investor, the complaint here does not provide reason to believe the same is true of Wilson. And whereas *Ashland* focused on the effect of Morgan Stanley's website disclosures on an investor's reasonable reliance on contrary representations, our own focus is on the effect of similar disclosures on whether a manipulative act can be sufficiently pleaded. But these distinctions, in our view, do little to blunt *Ashland*'s application to this case. Our assessment of whether Wilson has pleaded a "manipulative act" does not turn on how Wilson may have interpreted Merrill's disclosures; indeed, Wilson does not claim that he directly relied on any statement attributable to Merrill. Rather, in analyzing this claim, we look to whether Merrill's support bidding sent a false signal to the Merrill ARS market as a whole. For the same reasons that *Ashland* held that Morgan Stanley's website "explicitly disclosed the very liquidity risks about which appellants claim to have been misled," it is difficult to see how investors in Merrill ARS, in light of Merrill's substantially similar website disclosures, could have reasonably assumed that the lack of auction failures was indicative of genuine market liquidity rather than Merrill's routine placement of support bids. *Ashland*'s holding therefore

25

reinforces our conclusion that Wilson has failed to plead "manipulative acts."[9]

### 3. The SEC Brief

Prior to this appeal, the SEC had taken a number of regulatory actions with respect to ARS, including but not limited to the 2006 SEC Order and the 2008 preliminary settlement. In its amicus brief, TAC argues that the legal positions adopted by the SEC with respect to these actions are entitled to substantial deference, but in its responsive submissions, Merrill contests the notion that such regulatory actions merit deference. Mindful of the SEC's "expertise in administering the securities laws, its ability to seek input from the public when crafting regulatory policy, and its relative political accountability," *MSIF*, 592 F.3d 347, 361 (2d Cir. 2010), we determined that the proper resolution of this appeal would be aided by learning the agency's considered views on the particular questions that this case presents. Accordingly, after hearing oral argument, we invited the SEC to submit a letter brief addressing these issues, including the adequacy of Merrill's disclosures. We have benefitted from the SEC's exposition of this and other issues in its brief (the "SEC brief"). As set forth below, although we accept that brief's articulation of the legal principles that govern the sufficiency of disclosures for purposes of a market manipulation claim, we cannot defer to the SEC's conclusion that Merrill's disclosures were inadequate.

---

[9] The foregoing discussion of *Ashland* is limited to the application of that case's holding to the issues presented in this appeal. We do not mean to suggest that an investor's sophistication can never be relevant to a market manipulation claim, or that the effect of a particular disclosure on the element of reasonable reliance in a misrepresentation/omission claim is always equivalent to the effect of that disclosure on the sufficiency of a plaintiff's allegations of manipulative acts. Nor do we hold that website disclosures like those here and in *Ashland* may categorically immunize ARS dealers from claims that their bidding practices were manipulative, regardless of what the dealer knew and communicated to investors about its bidding practices and the securities' liquidity.

26

The SEC brief's discussion of market manipulation begins with two legal propositions. First, the SEC notes that "[i]n certain circumstances, disclosure can prevent a false signal from being sent to the market, thereby undermining a claim of manipulation." SEC Br. at 11. Second, the SEC observes that "[c]ourts have long recognized . . . that disclosure of a potential risk is insufficient when, in fact, the risk is much greater and/or is a known certainty." *Id.* These principles, which are not disputed by the parties, are also firmly rooted in our precedents. We therefore accept them without the need to consider the extent to which they are entitled to deference.[10]

The SEC brief goes on to apply these legal principles to Merrill's disclosures. The SEC finds Merrill's disclosures to be misleading in "imply[ing] that some auctions have sufficient independent demand to prevent failure." *Id.* at 12. The SEC asserts that Merrill's statement that it "may routinely" place support bids is inconsistent with Merrill's "alleged practice of placing bids in every auction specifically for the purpose of preventing failure," in that this formulation "misleadingly describe[s] as contingent something that plaintiff alleges was a certainty." *Id.* at 13. Although the SEC does not specifically provide an example of what an adequate disclosure of Merrill's bidding practices might resemble, it notes that there would "be no inaccuracy . . . in disclosing that Merrill currently placed support bids in all of its auctions, that without such bids the auctions would fail, and that Merrill reserved the right not to bid in the future." *Id.*[11]

---

[10] We note that the SEC brief does not define the precise "risk" that Merrill is alleged to have downplayed. We assume for purposes of our analysis that this risk is the possibility that Merrill would invariably place support bids during the relevant period, and not merely the possibility that Merrill might place support bids in only some auctions.

[11] In support of their position that detailed disclosures of dealer bidding practices were required to avoid liability, Wilson and TAC point to a number of other actions by the SEC, including the SEC's March 2008 issuance of a no-action letter and its August 2010 adoption of a

The parties dispute the amount of deference that we owe to the SEC's views. Ordinarily, when an agency's regulation is ambiguous, courts will "defer to an agency's interpretation of its regulation[], even in a legal brief, unless the interpretation is 'plainly erroneous or inconsistent with the regulation' or there is any other 'reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'" *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2261 (2011) (quoting *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997)) (other internal quotation marks omitted). Here, Wilson and TAC contend that the SEC brief is entitled to "controlling" deference, *Auer*, 519 U.S. at 461.

In response, Merrill offers several reasons why, in its view, the SEC brief does not merit substantial deference. First, Merrill notes that in the context of interpreting Rule 10b-5, the Supreme Court has recently reiterated its "skepticism over the degree to which the SEC should receive deference regarding the private right of action" that courts have implied thereunder. *Janus Capital Grp., Inc. v. First Deriv. Traders*, 131 S. Ct. 2296, 2303 n.8 (2011); *see also id.* (recounting the Court's repeated disagreements with the SEC's "broad view" of Section 10(b)

_____

rule change proposed by the Municipal Securities Rulemaking Board ("MSRB"), a self-regulatory organization. The March 2008 no-action letter states that "[a]ppropriate disclosure" of dealer bidding with respect to municipal ARS "could consist of," *inter alia*, advance notice of the intention to bid in a particular auction. SIFMA, SEC No-Action Letter, 2008 WL 1887307 (Mar. 14, 2008). The MSRB rule, which governs municipal ARS, requires dealers of these securities to publish detailed information about their bidding practices and placement of specific bids. Order Granting Approval of Proposed MSRB Rule Change, Exchange Act Release No. 34-62755, 2010 WL 3301684 (Aug. 20, 2010). The SEC brief does not suggest that Merrill was required to have made the comprehensive disclosures described in the no-action letter. At any rate, even insofar as the SEC's position as expressed in its amicus brief warrants special deference, we do not extend such deference to the no-action letter. *See Gryl ex rel. Shire Pharm. Grp. PLC v. Shire Pharm. Grp. PLC*, 298 F.3d 136, 145 (2d Cir. 2002). Nor do we read the SEC brief as contending that Merrill's disclosures should be evaluated with reference to a rule that was adopted well after the end of the class period in this case and the collapse of the ARS market.

and Rule 10b-5); *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 151 n.3 (2d Cir. 2010) (stating that "the SEC's views on the scope of the *judicially created* implied right of action available under [Section] 10(b) and Rule 10b-5 are entitled to little or no deference").  Second, Merrill observes that this court, although ultimately rejecting a proposed distinction "between interpretations and applications of relevant agency promulgations" in terms of how much deference such statements warrant, remains "mindful that the institutional considerations that may lead us to defer to the SEC's views on the interpretation of its promulgations counsel a different course when the question presented calls for an assessment of the sufficiency of a complaint." *MSIF*, 592 F.3d at 363; *see also id.* ("The task of construing a litigant's pleading rests firmly with the courts.").  Third, Merrill asserts that because the SEC brief can be viewed as a continuation of the agency's litigation efforts regarding Merrill's alleged misrepresentations to its customers that culminated in the 2008 settlement, there may be reason to understand the agency's positions in this litigation as reflecting something less than its disinterested judgment.

In the circumstances of this case, we see no need to fix the "exact molecular weight" of the deference that we owe to the SEC's position. *Id.* at 362 (internal quotation marks omitted). We readily acknowledge that at least some deference to the agency's position is appropriate given the SEC's expertise and accountability.  Here, however, we are unable to agree with the SEC's application of the legal principles governing Merrill's disclosures even under the generous standard of deference that Wilson urges.  As discussed above, we find the complaint to be inconsistent as to how often Merrill placed support bids during the relevant period, and view other allegations of the complaint as incompatible with the notions that every auction would fail in the absence of Merrill's intervention or that Merrill knew by July 2007 that the ARS market was unsustainable.  Given our understanding of the complaint and this court's assessment of

29

similar disclosures in *Ashland*,[12] we cannot adopt the SEC's characterization that Merrill disclosed only a "potential risk" when the true risk "is much greater and/or is a known certainty."

In parting ways with the SEC's evaluation of Merrill's disclosures, we emphasize the limited nature of our holding today. We conclude only that Merrill's particular disclosures sufficiently alerted investors in Merrill ARS of the likelihood that the interest rates and apparent liquidity of these ARS reflected Merrill's own interventions in these auctions rather than the "natural interplay of supply and demand." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999). Our holding rests in substantial part on the fact that Wilson's purchase of his securities antedated the time that Merrill was alleged to have learned that the ARS market was no longer viable and to have made statements directed at investors that were at odds with its internal understanding of the liquidity of these securities. Because Wilson's complaint lacks well-pleaded allegations that as of the time of Wilson's purchase, Merrill presently intended to place

_____

[12] The *Ashland* panel acknowledged the SEC's filing of an amicus brief in this appeal but did not discuss the issue of deference. Rather, *Ashland* contrasted Ashland's and Wilson's complaints: whereas Wilson alleges that Merrill's policy of placing support bids was manipulative, Ashland's complaint was "in large part about Morgan Stanley's failure to step in and stabilize the market for SLARS" despite its assurances that it would do so. 652 F.3d at 338 n.3. It is true that Ashland's complaint differs from Wilson's in this regard. However, Ashland's complaint alleged not merely that Morgan Stanley's failure to continue its support of the SLARS market rendered misleading the financial advisor's assurances that Morgan Stanley would intervene and "make the market," but also that Morgan Stanley "failed to disclose that SLARS' liquidity depended solely on Morgan Stanley's continued intervention in the auctions" and withheld information about the frequency of its support bidding. *Ashland*, 700 F. Supp. 2d at 465. Insofar as *Ashland* held that Morgan Stanley's disclosures rendered unreasonable any reliance on assurances that the SLARS were liquid, that holding strikes us as irreconcilable with the SEC's view that Merrill's substantially similar disclosures understated the likelihood that Merrill would routinely place support bids. For these reasons, the distinctions between Ashland's and Wilson's complaints do not eliminate the tension between *Ashland*'s holding and the SEC's position in this appeal.

bids in every single auction, knew that each auction would fail if it did not place these bids, and signaled to its ARS investors that these securities were genuinely liquid, we have no occasion to address whether a hypothetical complaint containing such allegations would state a claim for market manipulation.

### B.    Control Person Liability

Having concluded that Wilson failed to state a claim for any primary violation of the securities laws, we affirm the district court's dismissal of his Section 20(a) claim alleging that Merrill Lynch & Co. is liable as a controlling person. *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).

### C.    Leave To Amend

Wilson contends that the district court erred by denying him leave to amend the complaint. "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

We see neither error nor abuse of discretion in the district court's dismissal of the complaint with prejudice. The complaint dismissed by the district court had already been amended once following the district court's consolidation order and again in connection with the substitution of lead plaintiffs. When Wilson filed the operative complaint, his counsel was on notice, through Merrill's prior letters and motion to dismiss, that Merrill believed that its disclosures precluded any claim that its support bidding was manipulative. Yet Wilson never asked the district court for leave to amend the complaint in this or any other respect. "While leave to amend under the Federal Rules of Civil Procedure is 'freely granted,' no court can be said to have erred in failing to grant a request that was not made." *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (citation omitted). For that reason alone, the district court was justified

31

in not providing Wilson with an additional opportunity to replead following its dismissal of his claims.

Alternatively, the district court concluded that further amendment of the complaint would be futile. "[W]here amendment would be futile, denial of leave to amend is proper." *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006). Wilson never indicated to the district court how further amendment would permit him to cure the deficiencies in the complaint. On appeal, he asserts in conclusory terms that "[g]reater detail can be provided" as to certain facts that the district court concluded were not pleaded with specificity. Wilson Br. at 59.[13] Wilson has neither provided us with any detail about these proposed new allegations nor explained how they could cure the deficiencies that led to the dismissal of his complaint. In the absence of "some indication as to what appellant[] might add to [his] complaint in order to make it viable, we see no reason to grant appellant[] relief in this Court which was not requested below." *Nat'l Union of Hosp. & Health Care Emps. v. Carey*, 557 F.2d 278, 282 (2d Cir. 1977) (citation omitted); *see also Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) (per curiam).

## CONCLUSION

For the foregoing reasons, we hold that Merrill's disclosures of its bidding practices preclude Wilson's market manipulation claim. Because Wilson has failed to satisfy the "manipulative acts" element of his Section 10(b) claim, we need not address his arguments directed toward the other elements of this claim or Merrill's arguments that we should affirm on

---

[13] The only allegations that the district court found to be lacking in particularity relate to the statements allegedly made by Merrill's financial advisors to ARS investors. *Merrill*, 704 F. Supp. 2d at 388-89.

32

alternative grounds.  Accordingly, the district court's judgment is **AFFIRMED**.