**DODONA I, LLC, Plaintiff,**

v.

**GOLDMAN, SACHS & CO., et al., Defendants.**

**No. 10 Civ. 7497 (VM).**

United States District Court, S.D. New York.

March 21, 2012.

Lawrence Jay Lederer, Robin B. Switzenbaum, Arthur M. Stock, Steven Lawrence Bloch, Josh Michael Rubens, Berger & Montague, P.C., Philadelphia, PA, David Scott Frydman, Frydman LLC, New York, NY, for Plaintiff.

Richard Howard Klapper, Christopher James Dunne, David Maxwell Rein, Harsh Nayan Trivedi, Jacob Eden Cohen, Jessica Patricia Stokes, Maya Krugman, Michael Thomas Tomaino, Jr., Theodore Edelman, William Rudolph Arthur Kleysteuber, IV, Sullivan and Cromwell, LLP, Christopher May Mason, Danielle M. McLaughlin, Ripley Hastings, Timothy W. Mungovan, Nixon Peabody LLP, New York, NY, for Defendants.

### DECISION AND ORDER

VICTOR MARRERO, United States District Judge.

Plaintiff Dodona I, LLC ("Dodona") brings this suit on behalf of a putative class of investors in two securities offerings led by defendants Goldman, Sachs & Co. ("GS & Co"), The Goldman Sachs Group, Inc. ("Goldman"), Hudson Mezzanine Funding 2006–1, Ltd. ("Hudson 1 Ltd."), Hudson Mezzanine Funding 2006–1, Corp. ("Hudson 1 Corp."), Hudson Mezzanine Funding 2006–2, Ltd. ("Hudson 2 Ltd."), and Hudson Mezzanine Funding 2006–2, Corp. ("Hudson 2 Corp.") (together with Hudson 1 Ltd., Hudson 1 Corp., and Hudson 2 Ltd., the "Hudson SPEs"), and former Goldman employees Peter L. Ostrem ("Ostrem") and Derryl K. Herrick ("Herrick") (collectively, "Defendants"). Dodona alleges violations of § 10(b) of the Securities Exchange Act of 1934 (" § 10(b)"), 15 U.S.C. § 78a et seq. (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b–5 promulgated thereunder ("Rule 10b–5"), 17 C.F.R. § 240.10b–5; § 20(a) of the Exchange Act (" § 20(a)"); common law fraud; aiding and abetting fraud; fraudulent concealment; and unjust enrichment.

On April 5, 2011, Goldman, GS & Co, Herrick, and Ostrem filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (Docket No. 48.) On April 6, 2011, the extant Hudson SPEs [1]—Hudson 2 Ltd. and Hudson 2 Corp.—filed a separate motion to dismiss (Docket No. 53), which adopted and incorporated the arguments made in their co-defendants' motion to dismiss. For the reasons discussed below, Defendants' motions to dismiss are GRANTED in part and DENIED in part.

### I. BACKGROUND

The facts below are taken from Dodona's Amended Class Action Complaint (Docket No. 40) ("Complaint" or "Compl.") and documents cited or relied upon therein. Except where specifically quoted, no further reference to these documents will be made. The Court accepts these facts as true for the purposes of ruling on the motions to dismiss. *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 180 (2d Cir.2008).

### A. THE SYNTHETIC COLLATERALIZED DEBT OBLIGATION

The allegations in this suit relate to the subprime mortgage crisis of the late 2000s, the causes and effects of which are now a regular feature of litigation in this Court and others. Specifically, Dodona's claims arise from its investment in two securities offerings, Hudson Mezzanine Funding 2006–1 ("Hudson 1") and Hudson Mezzanine Funding 2006–2 ("Hudson 2") (together, the "Hudson CDOs").

The Hudson CDOs were examples of a complex subspecies of financial instrument,

---

**1.** According to the Amended Class Action Complaint, Hudson 1 Corp. filed for dissolution on October 27, 2009, and Hudson 1 Ltd. was liquidated on October 29, 2009, Neither of the Hudson 1 entities has answered the

Complaint. In view of this situation, Dodona is directed to inform the Court how it intends to proceed against Hudson 1 Corp. and Hudson 1 Ltd.

the synthetic collateralized debt obligation. Whereas collateralized debt obligations ("CDO") are securities "backed by a portfolio of fixed-income assets," such as residential mortgages, a "synthetic CDO" does not actually own any cash assets. Instead, it "mimics" the cash flow of particular "referenced" assets by means of a transaction called the credit default swap ("CDS"). (Compl. ¶ 31.)

A CDS functions like a credit insurance agreement covering a referenced asset: one party, the "credit protection buyer," pays periodic premiums in exchange for a promise that the other party, the "credit protection seller," will make an insurance payout should the asset experience a "negative credit event," such as a payment default or credit rating downgrade. (*Id.* ¶ 33.) Synthetic CDOs allow investors to assume the position of the credit protection seller, betting that the referenced assets will not experience a negative credit event.

In the case of the Hudson CDOs, the referenced assets were residential mortgage backed securities ("RMBS"). RMBS are, in turn, collateralized by pools of residential mortgages. Thus, the investors in the Hudson CDOs, like Dodona, were betting that the referenced RMBS—and therefore the underlying residential mortgages—would perform well, and not experience negative credit events.

RMBS and CDOs are typically organized into prioritized tiers, called "tranches." The lowest tranche bears the highest risk but carries the greatest rate of return, while higher "senior" tranches provide the inverse. The level of risk each tranche bears is expressed via a credit rating assigned by a credit rating agency, such as Moody's or Standard & Poor's. Should the performance of the portfolio of underlying or referenced assets deteriorate, the lowest tranche, with the lowest credit rat-

ing, would suffer losses prior to the more senior tranches.

## B. *GOLDMAN'S ROLE IN THE SUBPRIME MORTGAGE MARKET*

Dodona's claims against the Defendants are built upon allegations that Goldman had a hand in many aspects of the subprime mortgage market in the late 2000s. Subprime mortgages are those mortgages with a high risk of default. During 2005, 2006, and 2007, Goldman: 1) purchased subprime loans on a bulk basis; 2) extended credit to mortgage originators (a/k/a, "warehouse lending"); 3) created and traded subprime and other RMBS and specific tranches of mortgage securitizations; 4) underwrote CDOs backed by RMBS; 5) invested as a principal in mortgage-related securities and transactions; and 6) established a "structured product correlation desk" that "structured and marketed synthetic CDOs collateralized by subprime mortgage-related assets." (*Id.* ¶ 41.) In 2005, Goldman reportedly underwrote at least fifteen CDOs backed by RMBS, and in 2006 it underwrote nineteen such CDOs.

For the purposes of this suit, Goldman's involvement in the subprime mortgage market is significant for two reasons. First, it means that by late 2006, Goldman had significant exposure to subprime mortgages. Goldman had bet heavily that residential mortgages would continue to do well; or, in financial parlance, Goldman was "long" on subprime mortgage-backed securities.

Second, Goldman's purchase of subprime loans, its dealings with mortgage originators, and its underwriting of RMBS provided Goldman, "by at least 2006," with information showing the deteriorating performance of subprime mortgages. (*Id.* ¶ 17.) According to a report that Goldman authored in 2010 for regulators, when Goldman structured or underwrote RMBS,

it performed its own due diligence, investigating 1) the counterparty; 2) loan level credit; 3) compliance; and 4) property valuation. Goldman also "review[ed] selected loan files, verif[ied] compliance with state and federal lending statutes, and selective[ly] review[ed][ ] property appraisals against comparable values." (*Id.* ¶ 48.) As a result of its due diligence, Goldman officials noticed an increase in negative credit events in subprime loans, such as early payment defaults, "kickouts," and repurchase claims.

In addition, Goldman outsourced mortgage appraisals to a firm called Clayton Holdings, Inc. ("Clayton"). According to media reports, Clayton began noticing "significant deterioration of lending standards" and "red flags" around 2005. (*Id.* ¶ 50.) A report Clayton produced to the Financial Crisis Inquiry Commission showed that, of the loans Clayton reviewed for Goldman in the first quarter of 2006, twenty-two percent were initial "rejects," *i.e.,* mortgages with flaws so serious that they should have been rejected outright; by the first quarter of 2007, that percentage had increased to 25.5 percent.

## C. *THE RISK REDUCTION PROGRAM*

As a result of Goldman's entanglement in the subprime mortgage market and the due diligence it performed related to some of those activities, by 2006, officials within Goldman were "aware of the increased risks in subprime lending," (*id.* ¶ 52), and had recognized a corresponding need to reduce Goldman's long exposure.

According to Michael Swenson ("Swenson"), the co-manager of Goldman's Structured Product Trading Group ("SPG"), during the summer of 2006, it became clear that the "market fundamentals in subprime" were going to have a "very unhappy ending." (*Id.* ¶ 55.) In his self-performance review for the fiscal year 2007,[2] Swenson explained, "[w]e were long and needed to reduce risk in a situation where there were few opportunities to shed the ABX indices[3] we were long [on]." (*Id.*) Josh Birnbaum ("Birnbaum"), Goldman's managing director for SPG Trading, gave a similar appraisal in his 2007 self-performance review: "Given how much ABX we had purchased through the broker market in 2006, the world would think [Goldman] was very long for the foreseeable future." (*Id.* ¶ 57.) Birnbaum concluded that Goldman needed to "flip [its] risk." (*Id.*)

Consequently, Goldman officials embarked on a "risk reduction program." (*Id.* ¶ 59.) In late 2006, Goldman "decided to reduce [its] overall exposure to the residential housing market ... given the uncertainty of the future direction of the housing market and the increased volatility of mortgage-related product markets." (*Id.* ¶ 67.) On December 14, 2006, Goldman's Chief Financial Officer David Viniar ("Viniar") convened a meeting to discuss the mortgage department's "position and risk," (*id.* ¶ 62), during which he reportedly directed a reduction in Goldman's positions in the subprime market. In a December 15, 2006 email, Viniar stated that Goldman should be "aggressive" shedding subprime assets, and predicted that "there will be very good opportunities as the market goes into what is likely to be even greater distress and we want to be in a

---

**2.** Goldman's first quarter for the fiscal year 2007 began on November 25, 2006, thus encompassing the Hudson 1 and Hudson 2 offerings.

**3.** The ABX is a group of indices created to measure the performance of select groups of subprime RMBS. "Investors can bet on (*i.e.,* go 'long') or against (*i.e.,* go 'short') the ABX indices by entering, among other things, into CDS with a counterparty." (Compl. ¶ 35.)

position to take advantage of them." (*Id.* ¶ 63.)

One way Goldman began offsetting subprime risk was by shorting RMBS and mortgage-backed CDOs—in other words, betting that subprime mortgages and the securities instruments built upon them would decrease in value. As Birnbaum explained after the fact, "[Goldman] should not only get flat, but get VERY short." (*Id.* ¶ 57.) Thus, according to Swenson, "[i]n November and December of 2006, we aggressively capitalized on the franchise to enter into efficient shorts in both the RMBS and CDO space." (*Id.* ¶ 55.) Goldman did this in part by "buying protection" in synthetic CDOs. (*Id.* ¶ 59.) In the first quarter of 2007, Goldman "go[t] short CDS on RMBS and CDOs, g[ot] short the super-senior BBB- and BBB index, and g[ot] short AAA index as overall protection." (*Id.* ¶ 78.) By March 2007, Goldman's SPG Trading unit had a net short position of $2.1 billion on certain mortgage assets, including CDS on RMBS and CDOs.

In November 2007, Goldman informed the SEC that between November 24, 2006 and August 31, 2007, it had reduced its overall exposure to "subprime mortgage backed securities" from $7.2 billion to $2.4 billion. (*Id.* ¶ 79.)

## D. *THE HUDSON CDOS*

The Hudson 1 and Hudson 2 offerings occurred during this shift in Goldman's strategy. The Hudson 1 offering commenced on December 5, 2006; Hudson 2 commenced two months later, on February 8, 2007.

According to the "Marketing Book" [4] for Hudson 1, dated October 2006, "Goldman Sachs developed the Hudson CDO program in 2006 to create a consistent, programmatic, approach to invest in attractive relative value opportunities in the RMBS and structured product market." (Donne Decl., ex. H (Docket No. 50).) GS & Co, Goldman's broker-dealer subsidiary, structured the deals, served as the underwriter and selected the referenced RMBS assets; [5] it also "warehoused" the portfolio prior to closing and served as the liquidation agent. For these services, GS & Co received a fee of $30.1 million for Hudson 1 and $4.5 million for Hudson 2, which derived from the gross proceeds of the offerings. The Hudson CDO offerings were implemented through the creation of the Hudson SPEs, "special purpose entities" formed by Goldman for the sole purpose of issuing and selling the Hudson CDO securities. Ostrem and Herrick, who were vice presidents in SPG Trading, led the offerings.

Hudson 1 and Hudson 2, which were synthetic CDOs, were nearly identical in both structure and collateral content. Hudson 1 consisted of $837 million of notes, organized into eight separately-rated tranches, and a $1.2 billion senior swap transaction. Hudson 1 referenced 140 subprime-related and other RMBS through CDS, and carried an aggregate notional amount of approximately $2 billion.[6] Hudson 2 consisted of $407.9 million of notes, also organized into eight tranches, and referenced eighty RMBS through CDS with an aggregate notional amount of

---

**4.** Dodona cites and quotes from the Marketing Book in the Complaint. Defendants submitted the full Marketing Book in support of their motions to dismiss.

**5.** The Hudson CDOs were "static," meaning that they were not actively managed by a CDO manager. Once the referenced assets were selected, they could only be modified, sold, or transferred in limited circumstances.

**6.** As described in the Marketing Book, dated October 2006, Hudson 1 was "A $2.0 Billion Static Mezzanine Structured Product CDO." (Donne Decl., ex. H.)

$400 million. All the RMBS referenced in Hudson 2 were also referenced in Hudson 1.

The Marketing Book for Hudson 1 reported that "Goldman ha[d] aligned incentives with the Hudson program by investing in a portion of equity and playing the ongoing role of Liquidation Agent." (*Id.*) In other words, Goldman was long on a portion of the equity notes, the lowest tranche. However, Goldman was also short on the entire value of the Hudson CDOs. Non-defendant Goldman Sachs International ("GSI"), a subsidiary of Goldman, served as the sole credit protection buyer for both of the Hudson CDOs, with Goldman as its guarantor.[7] This meant that Goldman, through its subsidiary, was on the opposite side of the CDS from investors. In the event that the referenced RMBS experienced a negative credit event, GSI would receive an insurance payout from the investors.

### 1. *The Hudson CDO Offering Circulars*

In connection with the Hudson CDO offerings, GS & Co published two offering circulars (the "Offering Circulars"), which detailed the structure and terms of the Hudson CDOs, explained the roles of the various parties, and made risk disclosures and disclaimers.[8] The Offering Circulars—each over 100 pages—listed the credit ratings and par value for each tranche of securities, and provided a diagram of the structure of the transaction. In appendices, they specifically included the names and identifying "CUSIP" numbers of the referenced RMBS, as well as the credit scores and average loan-to-value ratios of the underlying mortgage borrowers.[9] The Offering Circulars also described the negative credit events which, under the terms of the CDS, would trigger payments by the credit protection sellers to the credit protection buyers.

In addition to the structure and terms of the Hudson CDO offerings, the Defendants also made risk disclosures and disclaimers in the Offering Circulars. These included general reminders that investing in securities is "SPECULATIVE AND INVOLVES SIGNIFICANT RISK"; (*id.,* ex. A at 5, ex. B at 5); that "[t]he use of leverage generally magnifies an investor's opportunities for gain and risk of loss"; (*id.,* ex. A at 45, ex. B at 41); that credit ratings are "not a guarantee of quality"; (*id.,* ex. A at 55, ex. B at 52); and that the value of the investment could fluctuate based on the "the credit quality of the underlying pool of assets . . . general economic conditions, [and] the condition of certain financial markets . . . ." (*id.,* ex. A at 49, B. at 46.) The Offering Circulars also discussed the risks associated with RMBS in particular, such as the risk of geographically concentrated underlying mortgages and "balloon" or "jumbo" loans. (*Id.,* ex. A at 52, ex. B at 49.)

The Defendants disclosed that "[v]arious potential and actual conflicts of interest may arise" from other activities of GSI, GS & Co, and their affiliates, and that it was expected that GS & Co would have under-

---

7. For Hudson 1, GSI was also the initial swap counterparty for the $1.2 billion senior swap.

8. Dodona cites and quotes from the Offering Circulars in the Complaint. Defendants submitted the full Offering Circulars in support of their motions to dismiss.

9. The Offering Circulars also enumerated the percentages of the referenced RMBS that would be "prime," "midprime," and "subprime." For Hudson 1, as of the closing date, 4.65 percent were expected to be prime, 54 percent were expected to be midprime, and 41.35 percent were expected to be subprime. For Hudson 2, as of the closing date, 62.5 percent were expected to be midprime and 37.5 percent were expected to be subprime.

written some of the referenced RMBS. (*Id.*, ex. A at 56–57, ex. B at 53–54.) In particular, the Offering Circulars noted that the GS & Co and GSI might have "interests different from or adverse to" the note holders and might possess material, non-public information regarding the Hudson CDO securities, but had no obligation of disclosure. (*Id.*, ex. A at 57–58, ex. B at 53.) Accordingly, the Offering Circulars required purchasers to represent that they were "sophisticated investor[s]," that they had consulted with their own advisors, and that they "had access to such financial and other information . . . as [ ] necessary and appropriate in order to make an informed investment decision," including "a full understanding of all of the risks . . . ." (*Id.*, ex. A at 9, ex. B at 9.) Investors were instructed to "CONSIDER AND ASSESS FOR THEMSELVES THE LIKELY LEVEL OF DEFAULTS ON THE REFERENCE OBLIGATIONS, AS WELL AS THE LIKELY LEVEL AND TIMING OF RECOVERIES ON THE REFERENCE OBLIGATIONS." (*Id.* ex. A at 8–9, ex. B at 8–9.)

Finally, the Offering Circulars identified GSI as the "Credit Protection Buyer," and the "initial Credit Protection Buyer." (*Id.*, ex. A at 25, 100, ex. B at 24, 94.) More specifically, the Offering Circulars disclosed that "[i]t is expected that Goldman Sachs International, an affiliate of Goldman Sachs & Co., will act as the sole Credit Protection Buyer, which creates concentration risk and may create certain conflicts of interest." (*Id.*, ex. A at 50, ex. B at 47.) In total, each Offering Circular identified GSI as the "Credit Protection Buyer" at least seven times.

## E. *AFTERMATH AND ALLEGATIONS*

Dodona purchased $3 million of Hudson 2 notes from GS & Co on approximately January 24, 2007; and $1 million of the Hudson 1 notes on approximately February 6, 2007 from an intermediate fund, which had purchased its securities from GS & Co.

The credit quality of the Hudson CDOs rapidly deteriorated at the same time as the downturn of the housing market. By September 2007, Moody's downgraded the credit rating of certain of the Hudson 1 notes and placed on "negative watch" certain of the Hudson 2 notes. By mid–2008, Standard & Poor's had downgraded $286 million of the Hudson 2 notes, and the Hudson 1 notes were downgraded to junk status. Certain of the Hudson 1 notes were liquidated by April and May of 2009 "reportedly at large losses." (Compl. ¶ 116.) As the credit protection buyer, GSI would have received insurance payouts as a result of those downgrades.

The fallout of the subprime crisis spurred regulatory and legislative investigation. In April 2011, the U.S. Senate Permanent Subcommittee on Investigations ("Senate Subcommittee") released its findings regarding the financial crisis, including the role that Goldman and other investment banks played. The Senate Subcommittee and its members cited the Hudson CDOs, among several other securities offerings, as evidence that Goldman "issued and sold to clients RMBS and CDO securities containing or referencing high risk assets that Goldman Sachs wanted to get off its books," and that Goldman's strategic shorting allowed it to "profit[ ] from the loss in value of the very CDO securities it had sold to its clients." (*Id.* ¶¶ 108, 52.)

The Complaint quotes extensively from the testimony and documents produced to and memoranda and findings prepared by the Senate Subcommittee. The Complaint's allegations of fraud draw from the Senate Subcommittee's conclusions. In particular, Dodona alleges that the Defendants created the Hudson CDOs as part of a scheme to decrease Goldman's subprime

exposure at the expense of its investors by shorting those same CDOs; that Defendants failed to disclose this strategy to investors; and that Defendants failed to disclose that they did not reasonably believe that the Hudson CDOs would be profitable for investors like Dodona. Dodona claims it suffered damages when the Hudson CDO notes were liquidated and when it sold them at a loss.

## II. *LEGAL STANDARD*

### A. *STANDARD OF REVIEW UNDER RULE 12(B)(6)*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.,* 383 F.Supp.2d 566, 574 (S.D.N.Y.2005) (internal quotation marks omitted). The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002).

■ Plaintiffs claiming fraud, including securities fraud and common law fraud, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") by "stat[ing] with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b); *see ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007). A complaint alleging securities fraud must also meet the requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b), which requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is based on information or belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*

### B. *THE EXCHANGE ACT*

■ Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance...." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated thereunder, provides that it is unlawful, in connection with the purchase or sale of any security, "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact ... or (c) [t]o engage in any act, practice, or course of business which operates ... as a fraud or deceit...." 17 C.F.R. § 240.10b–5. Section 10(b) operates as a "broad" prohibition against manipulation, whether in the form of false statements or market manipulation. *United States v. Royer,* 549 F.3d 886, 900 (2d Cir.2008); *see ATSI,* 493 F.3d at 99. Dodona alleges 1) misrepresentations or omissions of material fact and 2) market manipulation.

#### 1. *Misstatements or Omissions of Material Fact*

■ "To state a claim under Rule 10b–5 for misrepresentations, a plaintiff must al-

lege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI*, 493 F.3d at 105.

■ In order to satisfy Rule 9(b) and PSLRA pleading requirements, "[a] securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent," *Id.* at 99. An omission is actionable "only when the [defendant] is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993). Although "Rule 10b–5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a 'duty to be both accurate and complete.' " *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F.Supp.2d 166, 180 (S.D.N.Y.2010) (*quoting Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir.2002)).

■ Whether a misstatement or omission is material is "an inherently fact-specific finding ... that is satisfied when a plaintiff alleges a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Litwin v. Blackstone Grp. L.P.*, 634 F.3d 706, 716–17 (2d Cir.2011) (internal quotation marks and citations omitted). Since materiality is a mixed question of law and fact, "a complaint may not properly be dismissed ... on the ground that the alleged misrepresentations or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134 IBEW Joint*

*Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir.2009) (internal quotation marks omitted).

### 2. *Market Manipulation*

■ A claim of market manipulation under § 10(b) and Rule 10b–5 "requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101.

■ "In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir.2011). However, allegations of misrepresentations or omissions alone cannot support a claim of market manipulation. *ATSI*, 493 F.3d at 101. Rather, "[t]here must be some market activity, such as 'wash sales, matched orders, or rigged prices.' " *Id.* (*quoting Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)). Essentially, a claim of market manipulation

> require[s] a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security.... The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.

*Wilson*, 671 F.3d at 130 (internal quotation marks and citations omitted).

■ In order to satisfy the heightened pleading standards for fraud, a complaint alleging market manipulation must "plead with particularity the nature, purpose, and

effect of the fraudulent conduct and the roles of the defendants," including "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI*, 493 F.3d at 102 (internal quotation marks omitted).

### 3. *Scienter*

 Scienter, "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (internal quotation marks omitted), is a required element of fraud, whether accomplished by misrepresentation or market manipulation. In order to plead a "strong inference" of scienter, plaintiffs must allege with particularity either (a) "facts to show that the defendant had both motive and opportunity to commit fraud[;]" or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001) (internal quotation marks omitted). In assessing whether a plaintiff has pled scienter, courts consider whether all the facts, taken together, give rise to an inference of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499.

 A complaint has sufficiently alleged "motive and opportunity to commit fraud" if it pleads facts showing that the defendant "benefited in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307–8 (2d Cir.2000). "Motives that are common to most corporate officers ... do not constitute 'motive' for the purpose[ ]" of establishing scienter. *ECA*, 553 F.3d at 198. The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer. *See, e.g.,*

*In re AstraZeneca Sec. Litig.*, 559 F.Supp.2d 453, 468 (S.D.N.Y.2008); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F.Supp.2d 163, 181 (S.D.N.Y.2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.").

 A plaintiff pleading the "conscious misbehavior or recklessness" theory of scienter must allege conduct which is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted). Specifically, a complaint sufficiently pleads scienter where it alleges defendants had " 'knowledge of facts or access to information contradicting their public statements.' " *Id. (quoting Novak*, 216 F.3d at 308).

### 4. *Reasonable Reliance and Loss Causation*

A plaintiff claiming securities fraud under § 10(b) and Rule 10b–5 must also establish that it reasonably relied on the defendant's alleged misrepresentations or omissions, and that the fraud caused the plaintiff's loss. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir.2003). "In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Id.*

 Reliance may be presumed in two circumstances. First, "in the case of omis-

sions, reliance on the omitted information may be presumed where such information is material." *Black v. Finatra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir.2005). Second, the "fraud on the market" theory creates a presumption of reliance if the securities were traded in an efficient market—*i.e.*, an "open and developed" market in which the price of securities are, in theory, determined by all available information. *Basic Inc. v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (internal quotation marks omitted); *In re Parmalat Sec. Litig.*, 376 F.Supp.2d 472, 508 (S.D.N.Y.2005) ("*Parmalat II* ").

 Loss causation is not subject to the heightened pleading standards of Rule 9(b) or the PSLRA. *See In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d 206, 234 (S.D.N.Y.2010) ("Loss causation need not be pled with particularity."). Instead, a short and plain statement suffices, as required under Rule 8 of the Federal Rules of Civil Procedure ("Rule 8"). Loss causation requires a link between the alleged misconduct and the ultimate economic harm suffered by the plaintiff, and a plaintiff must claim that "the loss [was] foreseeable and that the loss [was] caused by the materialization of the concealed risk." *Lentell v, Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir.2005).

### 6. *Control Liability*

 Liability for violations of § 20(a) of the Exchange Act is derivative of liability for violations of § 10(b). *See Sec. & Exch. Comm'n v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). Section 20(a) imposes liability upon "every person who, directly or indirectly, controls any person liable under any provision of [§ 10(b) ] or of any rule or regulation thereunder ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of ac-

tion." 15 U.S.C. § 78t. To establish a prima facie claim under § 20(a), a plaintiff must show "a primary violation by the controlled person and control of the primary violator by the targeted defendant ... and show that the controlling person was in some meaningful sense [a] culpable participant[ ] in the fraud perpetrated...." *Id.* (internal quotation marks omitted) (alterations in original).

### C. *COMMON LAW FRAUD*

 The elements of common law fraud under New York law are: "(1) a material misrepresentation or omission of fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Haggerty v. Ciarelli & Dempsey*, 374 Fed.Appx. 92, 94 (2d Cir.2010) (*citing Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 883 N.Y.S.2d 147, 910 N.E.2d 976 (2009)). "Because the elements of common-law fraud in New York are substantially identical to those governing § 10(b), the identical analysis applies." *In re Optimal U.S. Litig.*, 837 F.Supp.2d 244, 2011 WL 6424988 (S.D.N.Y.2011) (internal quotation marks omitted).

 To state a claim for aiding and abetting fraud under New York law, a plaintiff must plead facts showing (1) the existence of a fraud; (2) defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. *See Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir.2000). "The knowledge requirement of an aiding and abetting fraud claim is satisfied by alleging actual knowledge of the underlying fraud." *JP Morgan Chase Bank v. Winnick*, 406 F.Supp.2d 247, 252 (S.D.N.Y.2005) (citation omitted). "A defendant provides substantial assistance

only if [she] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." *Id.* at 256 (internal quotation marks omitted).

### D. *UNJUST ENRICHMENT*

 "Under New York law, an unjust enrichment claim requires a plaintiff to prove that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 339 (2d Cir.2011).

## III. *DISCUSSION*

### A. *OF BIG OLD LEMONS AND LEMONADE*

As elaborated below, Dodona's theory of securities law violations rests not upon a single decisive action which manifestly demonstrates Goldman's alleged wrongdoing, but on a series of interrelated events which, viewed as a whole, represent the big picture of fraudulent conduct Dodona portrays. To properly evaluate the underlying claims and defenses, an overview of Dodona's essential points would be helpful at this juncture.

Foremost in this review is the origin of the investments at issue. In this regard, a vital issue embedded in Dodona's factual recitation is that, when created in 2007, Goldman's Hudson securities were designed primarily not as instruments meant to earn returns for Goldman's clients, but to solve a huge internal problem Goldman then faced: its enormous financial exposure from Goldman's vast holdings of subprime mortgage-backed investments. Goldman had acquired those assets pursuant to its earlier strategy of going long on them at a time when Goldman bet that the residential mortgage market would continue to expand. By 2007, as the performance of subprime mortgages deteriorated and the markets for them soured, Goldman sought to protect against its significant long exposure and offset its risk by reversing course and going short on the same type of investments. It thus created the synthetic CDOs here in dispute, a form of investment instrument that, Rube Goldberg-like, few but a select group of its own designers, engineers and lawyers could clearly explain, let alone understand, precisely how it functions or exactly what it does.

As described by Dodona, however, the operation and purpose of several key components of the Hudson transactions were clear enough, at least to Goldman: Goldman would aggressively discard its toxic subprime assets. It would then take advantage of new opportunities to capitalize on its flipped strategy to go short on subprime mortgage-backed securities it had reason to know would then decline in value, by betting that the market for them would continue deteriorating. Goldman would also earn significant fees from structuring and selling the new investments. In short, Goldman would stand to profit from the fine art of financial transubstantiation. In the facile, self-congratulatory words of a Goldman official quoted by Dodona, Goldman took some "big old lemons" and transformed them into "lemonade." In a similar vein, another Goldman official noted that a particular bank client was too smart to buy the load of "junk" Goldman had produced.

To these ends, Goldman entities selected the subprime mortgage assets to serve as the portfolio supporting the new instruments and served as broker-dealers, underwriters, and liquidation agent. Through a subsidiary, Goldman also set itself up as the credit protection buyer in order to take the position opposite the CDO investors, thus guaranteeing that

Goldman would collect insurance in the event the referenced RMBS it had selected (and marketed to investors through the CDOs) performed poorly, as in fact the market for them generally was already doing at the time. Nevertheless, Goldman stated in one of its Marketing Books that the Hudson CDO it had developed represented "a consistent, programmatic approach to invest in attractive relative value opportunities in the RMBS and structured product markets." All Goldman needed for success of its venture was large "sophisticated" investors like Dodona, which would drink up the bittersweet potion despite Goldman's boilerplate warnings that investing in the Hudson CDOs was speculative and involved significant risk. Goldman thus managed to shift its significant subprime risk over to its own clients.

On these alleged facts, Dodona asserts that Goldman engaged in fraudulent conduct. Dodona's theory, consistent with the spirit of the securities laws, conveys an implicit point: that when investors, sophisticated or not, purchase securities they do so in reliance on the reputation for integrity and good faith of the issuers and dealers, placing trust in their agents' implied representations that they would not engage in conduct which would place their own interests ahead of those of their customers.

Goldman, on the other hand, here asks the Court to dismiss Dodona's complaint in its entirety, in essence arguing that even if everything Dodona says is true, Goldman's actions violated no laws—in effect, that all of Goldman's actions are perfectly normal and unassailable under prevailing law and industry standards. The Court is not persuaded that the law compels Goldman's narrow interpretation. On a fair reading of Dodona's Complaint, if the facts alleged were borne out at a trial, Goldman's conduct, viewed charitably, could be found not only reckless, but bordering on cynical.

## B. *SECTION 10(b) AND RULE 10b–5 CLAIMS*

Dodona claims that GS & Co, Hudson 1 Corp., Hudson 2 Corp., Ostrem, and Herrick made misrepresentations and omissions of material fact in connection with the Hudson CDO offerings in violation of § 10(b) and Rule 10b–5(b); and that Goldman, GS & Co, Hudson 1 Corp., Hudson 2 Corp., Ostrem, and Herrick committed market manipulation in violation of § 10(b) and Rule 10b–5(a) and (c).

### 1. *Scienter*

Since both the claim of misrepresentations and omissions and the claim of market manipulation require Dodona to plead scienter, the Court will analyze that element first.

Dodona alleges that Defendants structured, marketed, and sold the Hudson CDOs with the intent of reducing Goldman's long exposure to subprime risk by betting against them. According to Dodona, the Defendants knew that the referenced RMBS would decline in value and intentionally selected RMBS which would perform poorly. The Court finds that Dodona has alleged particularized facts supporting a strong inference of Defendants' recklessness, at least, if not motive and opportunity as well, and that "someone whose intent could be imputed to the corporation acted with the requisite scienter," *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir.2008).

### a. *Recklessness*

The Complaint alleges that Defendants knew that they were selling toxic assets to their clients and that the Hudson CDOs were unlikely to profit investors. At this preliminary stage of the proceedings, Dodona has pled with sufficient particularity that Defendants had "knowledge of facts

or access to information contradicting their public statements," *Kalnit,* 264 F.3d at 142 (internal quotation marks omitted), and thus were reckless.

First, the Complaint quotes several emails and documents, authored by Goldman officials, acknowledging that in late 2006, Goldman embarked on a program to reduce its long exposure to subprime mortgages. Second, the Complaint contains detailed factual allegations that Goldman did unload significant subprime risk during the first part of fiscal year 2007. Third, the timing of the Hudson CDOs in December 2006 and February 2007 coincides with Goldman's decision to reduce subprime risk, a fact which circumstantially supports the allegation that the Hudson CDOs were in line with and part of the subprime risk reduction strategy.

Fourth, the Complaint quotes several emails which tie the Hudson CDOs, in particular, to the decision to reduce or "move" subprime risk, and which indicate awareness on behalf of at least some Goldman officers and employees that the Hudson CDOs referenced assets that would most likely lose value. These include:

- An email dated October 11, 2006 to Herrick, reflecting that Goldman employee Sarah Lawlor stated with regard to Hudson 1 that Goldman client Allied Irish Bank was "too smart to buy this kind of junk." Herrick responded, "[v]ery interesting." (Compl. ¶ 110.)

- An email dated October 26, 2006, from Arbind Jha to several Goldman executives, including Goldman's CEO and Ostrem and Herrick, stating: "Risk reduction is primarily due to pricing of $2bn Hudson Mez synthetic CDO deal (SPG Secondary desk bought $325k/bp BBB and $350k/bp BBBRMBS Subprime protection)[.]" (*Id.* ¶ 56.)

- An email dated December 5, 2006, the same day as the Hudson 1 offering, from Dan Sparks ("Sparks"), the head of Goldman's mortgage department, to several other Goldman executives, reporting: "Subprime market getting hit hard ... At this point we are down $20mm today. Structured exits are the way to reduce risk. Our prior structured trade closes today [presumably Hudson 1]. We are focusing on ways to do it again much faster." (*Id.* ¶ 60.)

- An email dated December 15, 2006 from Birnbaum that was copied to Swenson and stated: "we've had good traction moving risk through our franchise on a variety of fronts: ABX, single names, super-senior, Hudson 2." (*Id.* ¶ 64.)

- An email dated December 20, 2006, from Stacey Bash–Polley to Ostrem, Swenson, and Birnbaum, among others, reporting that "[w]e have been thinking collectively as a group about how to move some of the risk. While we have made great progress moving the tail risks—ssr and equity—we think it is critical to focus on the mezz risk that has been built up over the past few months. Both through sequential abacus ssr/equ trades and the hudson deals (current and prior)." (*Id.* ¶ 66.)

- An email dated January 26, 2007 from Sparks to Thomas Montag, Goldman's head of trading and sales, which said: "Need you to send message to peter ostrem and darryl herrick telling them what a great job they did. They structured like mad and travelled the world, and worked their tails off to make some lemonade from some big old lemons." (*Id.* ¶ 70.)

Fifth and finally, the Complaint alleges that, because of GS & Co's role as an underwriter and more generally through Goldman's performance of due diligence and reliance on Clayton, Defendants had access to nonpublic information regarding the deteriorating credit quality of subprime mortgages. On their own, allegations regarding due diligence and underwriting might not satisfy the heightened pleading standard of Rule 9(b) and the PSLRA. For example, it is unclear to what degree the information Defendants allegedly gathered from due diligence was in fact nonpublic; as Dodona acknowledges in the Complaint, the performance of at least some of the RMBS referenced in the Hudson CDOs could be tracked through the public ABX indices. Moreover, an "unsupported general claim of the existence of confidential company ... reports that revealed [contrary information] is insufficient to survive a motion to dismiss." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir.1996).

However, Goldman's sudden—and prescient—shift to reducing subprime risk supports the inference that it possessed some unique insight; it is not unreasonable to infer that GS & Co's role as underwriter and the due diligence Goldman performed provided Defendants with material nonpublic information supporting that decision. *See In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d at 235 ("Citigroup, as the underwriter of the CDOs it held, knew the inputs and assumptions that went into creating these assets and thus was in the best position to recognize the threats they faced as the subprime mortgage market deteriorated."). Thus, when considered together with the rest of the factual allegations, the allegations regarding Goldman's due diligence and underwriting do support the strong inference that "the danger was ... known to [Defendants]." *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted).

The factual allegations in Dodona's Complaint are thus distinguishable from those at issue in *Landesbank Baden–Wurttemberg v. Goldman, Sachs & Co.*, 821 F.Supp.2d 616 (S.D.N.Y.2011), which Defendants cite as supporting dismissal. *Landesbank* also concerned a RMBS-backed CDO, called "Davis Square," which GS & Co underwrote and issued. The plaintiff-investor in *Landesbank*, claiming common law fraud, alleged that GS & Co knew that the underlying mortgages were riskier than the offering circular disclosed and bet against Davis Square by purchasing credit default swaps. The Court dismissed the complaint because it found that general allegations concerning Clayton's due diligence reports and GS & Co's role in the mortgage securitization business failed to support an inference that "Goldman knew in March of 2006 about the toxicity of the mortgages underlying Davis Square." *Id.* at 622.

Although Dodona's Complaint does make some of the same allegations concerning Clayton's reports and Goldman/GS & Co's due diligence, it also contains particularized allegations about how the Hudson CDOs fit within Goldman's risk reduction program, and how at least some of Goldman's officers were on notice that the Hudson CDOs were "junk." These allegations are supported by quotes from Goldman-authored documents, complete with dates and names. *See, e.g., In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F.Supp.2d 241, 268 (S.D.N.Y.2010) (finding sufficient allegations of recklessness where complaint cited emails and memo received by defendants indicating knowledge of lowered underwriting standards). Thus, in the absence of any single, particular smoking-gun document, the allegations in the Complaint *collectively* supply sufficient circumstantial evidence from which the Court

could reasonably infer Defendants' recklessness.[10]

Defendants argue that Dodona is improperly claiming "fraud by hindsight," *Xerion Partners I, LLC v. Resurgence Asset Mgmt., LLC,* 474 F.Supp.2d 505, 518 (S.D.N.Y.2007).[11] As Defendants point out, it is impossible to know for certain how a market will perform. However, "[t]he incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.,* 763 F.Supp.2d 423, 487 (S.D.N.Y.2011). There is a "vast gap" between the picture that Defendants presented to investors—of an admittedly risky investment, but one that was not in any way extraordinarily risky— and the actions that Goldman took coupled with the language regarding "junk" and "lemons" that appears in emails. *See In re Ambac,* 693 F.Supp.2d at 269. Indeed, Defendants' actions themselves—creating CDOs, selecting the referenced RMBS, and then betting heavily against them— indicate that "the company in fact saw the risks and, in consequence, maneuvered to avoid them." *In re Citigroup, Inc. Sec. Litig.,* 753 F.Supp.2d at 237 (finding that plaintiffs pled scienter via recklessness); *cf. ATSI,* 493 F.3d at 101 ("[S]hort selling—even in high volumes—is not, by itself, manipulative."). Therefore, considering all the factual allegations together and in the light most favorable to the plaintiff, Dodona has alleged facts supporting an inference of recklessness which is at least as compelling—if not more so—as any opposing inference.

b. *Motive and Opportunity*

The Complaint could also be read to support an allegation that Defendants possessed a motive and opportunity to perpetrate the alleged fraud because they "benefited in some concrete and personal way from the purported fraud." *Novak,* 216 F.3d at 307–08. At least one other opinion in this Court, *Dandong v. Pinnacle Performance Ltd.,* 2011 WL 5170293 (S.D.N.Y. 2011), found that similar allegations raised a strong inference of motive and opportunity. In *Dandong,* the plaintiff had invested in "credit-linked notes" which were supposed to be invested in low-risk assets. Plaintiffs alleged that instead of low-risk assets, defendant Morgan Stanley invested their principal in certain synthetic CDOs which Morgan Stanley had designed to fail so it could profit from short positions on those same CDOs. The Court found that

> [Plaintiffs] have pled what amounts to self-dealing by Morgan Stanley, insofar as Morgan Stanley was betting against, or 'shorting,' the synthetic CDOs that it had itself created. The engineered fragility of the CDOs and Morgan Stanley's

---

10. Since Ostrem and Herrick were recipients of several of the emails quoted above, the Complaint has alleged with particularity that they knew that the Hudson CDOs were part of the risk reduction strategy, and that Herrick, at least, was on notice that the Hudson CDOs contained "junk" and "big old lemons," from which he diligently made "lemonade." (Compl. ¶¶ 70, 110.) Thus, Dodona has adequately alleged that the conduct of Ostrem and Herrick constituted recklessness. In addition, the Complaint alleges that the Hudson CDOs were created, directed, and controlled by GS & Co and Goldman. Scienter may therefore be imputed to the Hudson SPEs. *See Teamsters Local 445 Freight Div. Pension Fund,* 531 F.3d at 195.

11. Although the Complaint does cite several documents created after the time frame at issue, it also contains sufficient factual allegations, such as the emails quoted above, indicating that, at the time of the Hudson CDO offerings, Defendants knew that the referenced RMBS were highly risky and would perform poorly.

position on both sides of the deal adequately alleges motive. *Id.* at *12.

Dodona, like the plaintiffs in *Dandong*, is alleging more than a typical profit motive; it is alleging, in essence, that Defendants engaged in self-dealing by abusing their nonpublic knowledge and position of power to benefit themselves. The Complaint contains factual allegations indicating that Defendants not only knew that the Hudson CDOs were unlikely to be profitable and failed to disclose this to investors, but also that they sought to profit from that insight. For example, Goldman CFO Viniar urged that Goldman should aggressively distribute subprime-mortgage related assets "because there will be very good opportunities as the market goes into what is likely to be even greater distress and we want to be in position to take advantage of them." (Compl. ¶ 63.) Similarly, Birnbaum "concluded that [Goldman] should not only get flat, but get VERY short." (*Id.* ¶ 57.) Coupled with GSI's significant short position on the Hudson CDOs, these statements indicate motive and opportunity.

In sum, the Court finds in its "practical judgment" that the "whole factual picture painted by the [C]omplaint" gives rise to a strong inference of scienter. *Slayton v. American Express Co.*, 604 F.3d 758, 775 (2d Cir.2010).

### 2. *Material Omissions*

■ Dodona claims that GS & Co, Hudson 1 Corp., Hudson 2 Corp., Ostrem, and Herrick (collectively, the "Marketing Defendants") made omissions of material fact when they marketed the Hudson CDOs and drafted the Offering Circulars. Specifically, Dodona alleges that the Marketing Defendants did not disclose to investors (1) that the Hudson CDOs were structured and issued as part of Goldman's strategy to reduce its exposure to subprime-mortgage risk and to profit by betting against them; and (2) that the Marketing Defendants did not "genuinely believe that the Hudson CDOs would have a realistic chance of being profitable for investors . . . ." (Compl. ¶ 176.)

The Complaint cites the following statements in the Marketing Book and the Offering Circulars as misleading:

- "GSI will be the initial Credit Protection Buyer . . . ." (*Id.* ¶ 175.)
- "Goldman has aligned incentives with the Hudson program by investing in a portion of equity and playing the ongoing role of Liquidation Agent." (*Id.* ¶¶ 89, 122, 175.)
- The Hudson CDOs were designed "to create a consistent, programmatic, approach to invest in attractive relative value opportunities in the RMBS and structured product market." (*Id.* ¶¶ 85, 175.)
- "INFORMATION CONTAINED IN THIS OFFERING CIRCULAR . . . DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION." (*Id.* ¶ 88, 96, 175.)
- Investing in the Hudson CDOs "IS SPECULATIVE" and involves "SIGNIFICANT RISK." (*Id.* ¶ 175.)
- "Various potential and actual conflicts of interest may arise from the overall activities of the Credit Protection Buyer [GSI], the overall underwriting, investment and other activities of the Liquidation Agent [GS & Co], the Senior Swap Counterparty and the Collateral Put Provider, their respective affiliates and its clients and employees and from the overall investment activity of the Initial Purchaser [GS & Co], including in other transactions with the Issuer [Hudson 1/2 Ltd]." (*Id.*)

Dodona's Complaint does not rest on allegations that those overt statements

were, standing alone, false, but rather on the requirement that "once a party chooses to speak, it has a duty to be both accurate and complete." *Plumbers' Union*, 753 F.Supp.2d at 180 (internal quotation marks omitted). The Complaint alleges that those statements were misleading because of what they did not say: that the Marketing Defendants' knew of the deteriorating credit quality of the referenced assets, believed that the Hudson CDOs had no realistic chance of being profitable, and that the Hudson CDOs were part of Goldman's risk reduction strategy. Dodona has thus met the PSLRA's requirement that a Complaint alleging misrepresentations "specify each statement alleged to have been misleading[ ][and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b).

However, since Dodona's allegations of misrepresentation sound in omission, the question remains whether the Marketing Defendants had a duty to disclose either of the omissions alleged; and, if so, whether disclosures or publicly available information discharged them of that duty. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 267 ("an omission is actionable under the securities law only when the [defendant] is subject to a duty to disclose the omitted facts").

### a. *No Duty to Disclose Strategy*

The Court finds that the Marketing Defendants had no duty to disclose that the Hudson CDOs were part of "Goldman's then-existing strategy to reduce its financial exposures to subprime mortgage-related assets" and to profit thereby. (*Compl.* ¶ 175.) The Offering Circulars and Marketing Book say nothing about Goldman's long-term investment and risk-management "strategy," or how the Hudson CDOs might fit into some overarching plan. Nor are there any independent statutory or regulatory disclosure obligations that would have required the Marketing Defendants to reveal such a strategy. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir.2010) (failure to meet "[a]ffirmative [d]isclosure [o]bligations" is one form of omission that can create federal securities law liability). Since "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5," *Basic Inc.*, 485 U.S. at 239 n. 17, 108 S.Ct. 978, the Marketing Defendants' nondisclosure of the alleged strategy is not an actionable omission.

### b. *Duty to State Risk Accurately and Completely*

However, the issue of whether the Marketing Defendants had a duty to disclose their "belief" that the Hudson CDOs did not "have a realistic chance of being profitable for investors" is a closer question. Reading the Complaint in its entirety, it is clear that the alleged omission amounts to an allegation that Defendants inaccurately represented the risk, of which they were actually aware, associated with investing in the Hudson CDOs. Contrary to Defendants' contentions, the alleged omission is therefore more substantial than a failure to disclose "mere disbelief" or "opinions." (Def. Br. at 17–19 (Docket No. 49).) Since the Offering Circulars contained affirmative representations regarding the risks of investing,[12] the Marketing Defendants had a duty to ensure that those statements were accurate and complete. *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,

---

**12.** According to Defendants, the Hudson CDO offerings were made pursuant to the limited requirements of SEC Rule 144A ("Rule 144A"), 17 C.F.R. § 230.144A, which exempts registration for sales of restricted or controlled securities to "Qualified Institutional Buyers." Rule 144A does not require risk disclosures, but the Offering Circulars made them anyway.

538 F.Supp.2d 662, 669 (S.D.N.Y.2008) ("[R]isk disclosures must accurately characterize the scope and specificity of the risk, as understood at the time the statements are made[.]"); *see also In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 531 (S.D.N.Y.2010) ("[G]eneric risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks.").

Dodona has adequately alleged an actionable omission because, assuming it is right about the known risks, the risk disclosures in the Offering Circulars were inaccurate and therefore misleading. The Goldman-authored emails and documents cited in the Complaint—discussed above in the context of scienter—indicate that the Defendants were aware of a buildup of negative events in the subprime mortgage market, and knew the outlook for sub-prime-mortgage related assets was gloomy. Indeed, the Complaint indicates that Goldman had determined in late 2006 that the risks associated with subprime-related assets were substantial enough to warrant a major shift in strategy. Yet, in addressing the risks, the Offering Circulars provide only boilerplate statements regarding the "SPECULATIVE" and risky nature of investing in securities, the possibility of market downturns, and the risks generally associated with mortgage-backed assets. Given Dodona's allegations that Defendants were aware of singularly

prohibitive risks associated with the Hudson CDOs in particular, it follows that such boilerplate disclosures do not accurately represent Defendants' assessment of the risks.[13] *See Halperin v. eBanker USA. com, Inc.*, 295 F.3d 352, 359 (2d Cir.2002) (holding that a plaintiff can overcome risk disclosure statements and cautionary language if "the language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss"); *Dandong*, 2011 WL 5170293, at *12 (holding that "boilerplate" language in a prospectus cautioning that investment is "extremely risky" and the defendant "may" have interests adverse to investors was insufficient to defeat plaintiffs' allegation that Morgan Stanley designed CDO to fail); *In re Bear Stearns*, 763 F.Supp.2d at 495 ("[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit[.]" (internal quotation marks omitted)).

That said, Defendants are correct that the Offering Circulars and Marketing Book did *not* conceal that Goldman was short on the transactions. The Offering Circulars disclosed multiple times that GSI, an affiliate of defendants GS & Co and a subsidiary of Goldman, was the "sole Credit Protection Buyer" on the Hudson CDOs. (Donne Decl., ex. A at 50, ex, B at 47.) This stands in contrast to another

---

13. The extant Hudson SPEs argue that the Complaint fails to adequately link any misstatements or omissions to them. However, this argument is unavailing because the Offering Circulars clearly indicate that the Hudson SPEs "ACCEPT RESPONSIBILITY" for the information contained therein. (Donne Decl. ex. A, at 19.) Moreover, the "group pleading doctrine" applies to this claim. *See In re Bear Stearns Cos.*, 763 F.Supp.2d at 485; *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999) (group pleading doctrine allows plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information are the collective work of individuals with direct involvement in the everyday business of the company") (internal quotation marks omitted). Since the Complaint alleges what amounts to a "tight weave of connections between" all the Defendants, "[a]t this stage of the litigation, any misstatements that could reasonably be found to have issued from one, essentially issued from all." *Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 405 (S.D.N.Y.2010).

case in this Court, *Sec. & Exch. Comm'n v. Goldman Sachs*, 790 F.Supp.2d 147 (S.D.N.Y.2011), which found that the SEC had adequately pled that Goldman employee Fabrice Tourre made material misrepresentations in an email by failing to disclose hedge fund Paulson & Co.'s short position on a CDO.

Nevertheless, the disclosures in the Offering Circulars regarding GSI's role, which are admissions that Goldman was taking a huge bet against the Hudson CDOs, were somewhat undermined, or at least downplayed, by statements elsewhere that GSI was the "initial" credit protection buyer, that the Hudson CDOs were "attractive relative value opportunities in the RMBS and structured product market," or that "Goldman has aligned incentives with the Hudson program by investing in a portion of equity." (Compl. ¶¶ 85, 89, 122, 175.) Nor do the disclosures regarding GSI's short position jive with the boilerplate risk disclosures, which do not indicate anything unusual about the offerings. Ultimately, an incomplete or misleading disclosure may be just as damaging as total concealment.

### c. *Reliance and Materiality*

Since Dodona alleges omissions rather than affirmative misstatements, the element of reliance may be presumed if the omissions were material. *See Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 160, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008); *Black*, 418 F.3d at 209. With regard to materiality, the alleged omissions are not "so obviously unimportant" that reasonable minds could not differ—after all, the risks associated with an investment are typically of primary concern for prospective investors. *ECA*, 553 F.3d at 197 (internal quotation marks omitted); *see In re Am. Int'l*, 741 F.Supp.2d at 531 ("The purpose of the

federal securities laws is to ensure that investors have sufficient information to assess and avoid undue risks by refraining from purchasing securities that carry greater risks than the investor is willing to bear." (internal quotation marks omitted)). At this stage in the litigation, Dodona has sufficiently alleged the materiality of the omissions, and reliance may therefore be presumed.

Defendants argue that the Court should dismiss Dodona's claim because Dodona was a sophisticated investor, for whom reliance on the alleged omission would be unreasonable. *See Emergent*, 343 F.3d at 195 (finding that sophistication of parties is factor in assessing reasonableness of plaintiff's reliance); *Terra Sec. Asa Konkursbo v. Citigroup, Inc.*, 740 F.Supp.2d 441 (S.D.N.Y.2010), *aff'd* 450 Fed.Appx. 32 (2d Cir.2011) ("Sophisticated investors must investigate the information available to them with the care and prudence expected from people blessed with full access to information." (internal quotation marks omitted)). According to Defendants, investors had access to a "sea of publicly available information concerning the performance of the actual loans backing the [referenced RMBS]." (Def., Br. at 22.) In particular, Defendants point to the Offering Circulars' appendices, which contained information on each referenced RMBS, "including the credit scores and average loan-to-value ratios of the borrowers whose loans backed the RMBS, the names of the loan servicers, and the CUSIP number of each RMBS, which enabled investors to acquire extensive information from the public SEC filing for each of the [referenced RMBS]." (*Id.* at 9.)

 The Complaint rather conspicuously avoids discussing the nature of Dodona's business or making any representations regarding Dodona's level of sophistication.[14] But in order to invest

---

**14.** Defendants submitted a "Confidential Offering Memorandum" apparently published

in the Hudson CDOs, the Offering Circulars required Dodona to represent and agree was a "Qualified Institutional Buyer" and a "sophisticated investor" with "access to such financial and other information ... necessary ... in order to make an informed investment decision." (Donne Decl. ex. A, at 6–9.) Such representations may support a finding of sophistication. *See Terra,* 740 F.Supp.2d at 449.

■ However, even assuming that Dodona is sophisticated, it is unclear to the Court whether "the information necessary to unmask the alleged fraud [would] have been accessible to the sophisticated party through minimal diligence." *Id.* The public information that Defendants point out, such as individual SEC filings for each of the eighty or more referenced RMBS, seems like it would require much more than "minimal diligence" to analyze—even for a sophisticated investor. "Defendants have proffered nothing to suggest that investors were placed on guard about anything approximating the alleged fraud, that they were practically faced with the facts, or that they had access to truth-revealing information." *Dandong,* 2011 WL 5170293, at *14 (internal quotation marks omitted) ("[E]ven a sophisticated investor armed with a bevy of accountants, financial advisors, and lawyers could not have known that [the defendant] would select inherently risky underlying assets and short them.") Based on the allegations in the Complaint, whether Dodona was sophisticated and whether it should have uncovered the alleged fraud at the time of the investment using public information are questions of fact. Thus, prior

to discovery, the Court will not hazard a guess regarding Dodona's level of sophistication or the import of publicly available information.

#### d. *Loss Causation*

■ Finally, Dodona has made adequate allegations that the alleged omissions caused the ultimate economic harm Dodona suffered. Dodona alleges that due to its reliance on the "absence of material adverse information," it "purchased the Hudson CDOs at artificially inflated prices" and incurred damages when they suffered ratings downgrades, precipitously lost value and were ultimately liquidated. (Compl. ¶ 178.) Dodona claims that, were it not for the alleged omissions, it would not have purchased the securities, or would not have purchased them at inflated prices.

■ Although Defendants argue that Dodona's losses coincided with the general market downturn and therefore cannot be linked with the alleged fraud, the law does not require plaintiffs to plead facts "sufficient to exclude other non-fraud explanations." *King Cnty., Washington v. IKB Deutsche Industriebank AG,* 708 F.Supp.2d 334, 342 (S.D.N.Y.2010); *see In re Bear Stearns,* 763 F.Supp.2d at 507 ("[A]t the motion to dismiss phase, the Securities Complaint need not rule out all competing theories for the drop in ... stock price; that is an issue to be determined by the trier of fact on a fully developed record[.]"). Indeed, such an argument is "premised on a confusion of cause and effect. The conduct that plaintiffs allege, if true, would make [Goldman] an active participant in the collapse of [the

---

by Dodona as evidence that Dodona was sophisticated. The Court declines to consider that outside document as Dodona did not rely upon it in drafting the Complaint. *See Chambers,* 282 F.3d at 153 ("[A] plaintiff's *reliance* on the terms and effect of a document in

drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough[.]") (emphasis in original).

Hudson CDOs] and the financial markets in general, rather than a passive victim." *In re Ambac*, 693 F.Supp.2d at 270; *see In re Bear Stearns*, 763 F.Supp.2d at 504–05 (*citing In re Ambac*, 693 F.Supp.2d at 269).

Dondona has made allegations sufficient to support a reasonable inference that the omissions "bear upon the loss suffered such that [Dodona] would have been spared all or an ascertainable portion of that loss absent the fraud," *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir.2005). Thus, since the Complaint has pled each of the other elements necessary for a § 10(b) claim of misrepresentations or omissions, that claim survives Defendants' motions to dismiss.

### 3. *Market Manipulation*

 In addition to fraud by misrepresentation or omission, Dodona claims that Goldman and the Marketing Defendants manipulated the market for the Hudson CDOs in violation of § 10(b) and Rule 10b–5(a) and (c). The Complaint alleges that they used "manipulative and deceptive devices and practices" when they structured, issued and sold the Hudson CDOs with the belief that the Hudson CDO securities would not be profitable for investors, and the knowledge that the Hudson CDOs were part of Goldman's subprime risk reduction strategy. (Compl. ¶ 165.)

 A claim for market manipulation cannot be based on a misrepresentation or omission alone, but must involve a manipulative market activity. *See ATSI*, 493 F.3d at 101; *Wilson*, 671 F.3d at 130–31. In turn, "for market activity to be manipulative, that conduct must involve misrepre-

sentation or nondisclosure." [15] *Wilson*, 671 F.3d at 130 (*citing Santa Fe Indus.*, 430 U.S. at 477, 97 S.Ct. 1292 ("[N]ondisclosure is usually essential to the success of a manipulative scheme.")). As long as the market activity involved "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities," and such conduct "sen[t] a false pricing signal to the market[,]" it falls within the bounds of a deceptive or manipulative device. *ATSI*, 493 F.3d at 100 (internal quotation marks omitted).

Here, Dodona alleges that the act of structuring, offering, and selling the Hudson CDOs was itself a manipulative market activity. The Complaint alleges that these acts were manipulative because Defendants knew that the Hudson CDOs were based on toxic assets that would not likely be profitable for investors, and selected particularly risky RMBS to reference. Given the level of detail that the Complaint provides about how Goldman and the Marketing Defendants structured and offered the Hudson CDOs, Dodona has pled with requisite particularity "what manipulative acts were performed, which defendants performed them, [and] when the manipulative acts were performed...." *Id.* at 102 ("A claim of manipulation, however, can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.").

#### a. *Reliance on Efficient Market Assumption*

 However, in order for its market manipulation claim to survive Defendants'

---

**15.** In contrast to the omission claim under Rule 10b–5(b), in the context of market manipulation under Rule 10b–5(a) and (c), there is no need for Dodona to allege (or prove) that the Defendants had a duty to disclose stemming from a statutory requirement or an

otherwise misleading statement. Instead, a claim of market manipulation involves "secret manipulation," which need not include overt misleading statements. *In re Initial Pub. Offering Sec. Litig.*, 383 F.Supp.2d 566 (S.D.N.Y. 2005).

motions to dismiss, Dodona must also allege "reliance on an assumption of an efficient market free of manipulation[.]" *ATSI*, 493 F.3d at 101; *see In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 304 (S.D.N.Y.2005) ("*Parmalat I*"). Whether a market is efficient is a question usually addressed when plaintiffs argue "fraud on the market," which creates a rebuttable presumption of reliance where the market is efficient.[16] *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 199–200 (2d Cir.2008) (*citing Basic*, 485 U.S. at 242–49, 108 S.Ct. 978). In *ATSI*, the Second Circuit essentially incorporated "fraud on the market" into the standard for market manipulation by requiring that plaintiffs show "reliance on an assumption of an efficient market." *ATSI*, 493 F.3d at 99–103,

An efficient market is one that is "open and developed .... in which anyone, or at least a large number of persons, can buy or sell[,]" and "for which trading information (*e.g.*, price and volume) is widely available." *Parmalat I*, 375 F.Supp.2d at 304 (internal citations and quotation marks omitted). In addition, there is some case law in this Circuit to suggest that claims of market manipulation involving newly issued securities must fail because primary markets are by nature inefficient. *See In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 42–43 (2d Cir.2006) (holding that market for shares of an initial public offering is not efficient, in the context of fraud on the market) ("[A] primary market for newly issued [securities] is not efficient or developed under any definition of these terms." (internal quotation marks omitted) (alterations in original)).

"Whether a market is efficient is often a question of fact," *Parmalat II*, 376 F.Supp.2d at 508. However, Dodona's conclusory allegations regarding "artificially inflated" prices do not suffice to plead an "efficient market," as that term is commonly understood in the case law, especially when the rest of the Complaint contradicts such a conclusion. The Complaint does not allege that there was an open and developed market for the Hudson CDOs, or even that the price of the Hudson CDO securities reflected " 'all publicly available information, and, hence, any material misrepresentations.' " *Cromer Finance Ltd. v. Berger*, 205 F.R.D. 113, 130 (S.D.N.Y.2001) (*quoting Basic*, 485 U.S. at 246, 108 S.Ct. 978). Rather, the Complaint alleges circumstances in which the Defendants essentially created the market. Indeed, the Offering Circulars warn investors that "[t]here is currently no market for the [Hudson CDO securities]." (Donne Decl., ex. A, at 42.) The Hudson CDOs were thus plainly the product of Goldman's manipulation—which is presumably why investors like Dodona purchased them. *See In re Citigroup*, No. 08 Civ. 3096, 2011 WL 744745 (S.D.N.Y. Mar. 1, 2011) (dismissing market manipulation claim where plaintiffs conceded market was not efficient and publicly available documents revealed that market was "not necessarily set by the 'natural interplay of supply and demand' "). Ultimately, then, Defendants' alleged misconduct is more appropriately suited for a claim of misrepresentations and omissions than market manipulation, which carries with it an assumption of an efficient market. Thus, Dodona's allegation of market manipulation must be dismissed.

## C. *SECTION 20(a) CLAIM*

 Dodona claims that the Defendants, except for the Hudson SPEs, violat-

---

16. It does not appear that Dodona intended to argue "fraud on the market." The Complaint contains no discussion of market efficiency, and the parties' Rule 12(b)(6) submissions are likewise mute on the subject.

ed § 20(a) of the Exchange Act. Specifically, Dodona alleges that Goldman, GS & Co, Ostrem and Herrick directed and controlled the alleged misconduct of the Hudson SPEs.

As discussed above, Dodona has pled a primary violation under § 10(b) against the Marketing Defendants, which includes Hudson 1 Corp. and Hudson 2 Corp. In addition, the Complaint alleges that Goldman was the parent company of GS & Co, which underwrote and structured the Hudson SPEs, and that various Goldman executives and officers possessed scienter. It also alleges that Ostrem and Herrick were in charge of structuring, marketing, and selling the Hudson CDO offerings. As such, Dodona has sufficiently pled that Goldman, GS & Co, Herrick and Ostrem each controlled at least one primary violator and that they were in some meaningful sense culpable participants in the alleged fraudulent omissions. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (listing elements of prima facie case of liability under § 20(a)); *see also Parmalat II*, 376 F.Supp.2d at 517 (holding that Rule 8 governs the pleading standard for allegations of control pursuant to § 20(a), which need not be extremely detailed). Dodona's claim of § 20(a) liability therefore survives Defendants' motions to dismiss.

## D. *COMMON LAW FRAUD CLAIMS*

Dodona alleges common law fraud and fraudulent concealment against all Defendants. For the same reasons that Dodona's § 10(b) and Rule 10b–5 claim of fraudulent misrepresentations survive as to the Marketing Defendants, their common law fraud and fraudulent concealment claims also survive as to the Marketing Defendants. *See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F.Supp.2d 385, 407 (S.D.N.Y.2005) ("The elements of common law fraud thus are largely the same as those of a Rule 10b–5 claim except that there is no requirement that the fraud

be 'in connection with the purchase or sale of securities.'") (*quoting* 15 U.S.C. § 78j(b)); *Nealy v. United States Surgical Corp.*, 587 F.Supp.2d 579, 585 (S.D.N.Y. 2008) ("A claim for fraudulent concealment requires the same showing as that for fraudulent misrepresentation, with the additional requirement that the plaintiff must demonstrate that the defendant had a duty to disclose material information."). In addition, the common law fraud and fraudulent concealment claims survive as to Goldman, Hudson 1 Ltd. and Hudson 2 Ltd. (the non-Marketing Defendants) because the "group pleading doctrine" ties those defendants to the alleged omissions. *See supra* n. 13.

Dodona also claims that Goldman, Hudson 1 Ltd., Hudson 1 Corp., Hudson 2 Ltd., Hudson 2 Corp., Ostrem and Herrick aided and abetted common law fraud. The Complaint alleges that GS & Co "could not have perpetrated its fraud without the substantial assistance of Goldman, the Hudson issuers and defendants Ostrem and Herrick...." (*Compl.* ¶ 205.) As discussed above, the Complaint has adequately pled that GS & Co committed an underlying fraud. Moreover, the Complaint contains allegations sufficient to infer that Ostrem and Herrick, in their marketing and structuring of the Hudson CDOs, had actual knowledge of the alleged fraud and enabled or "substantially assisted" it. Through Ostrem and Herrick, knowledge of the fraud may be imputed to Goldman and the Hudson SPEs. In addition, it is evident from the Complaint that GS & Co could not have committed the alleged fraud without the substantial assistance of its parent corporation Goldman and Goldman executives, such as Ostrem and Herrick, or without the involvement of the Hudson SPEs, which were created for that very purpose. Therefore, the Court declines to dismiss this claim.

## E. *UNJUST ENRICHMENT CLAIM*

Finally, Dodona claims that Goldman and GS & Co were unjustly enriched at Dodona's expense. Defendants argue that this claim must fail because Dodona purchased the Hudson 1 securities from an intermediate party, rather than any of the Defendants, and thus Defendants were not enriched at Dodona's expense. In addition, Defendants argue that the Hudson 2 securities were governed by a written purchase agreement, and an unjust enrichment claim is unavailable when "a valid and enforceable contract governing the same subject matter exists." *Soroof Trading Dev. Co. v. GE Fuel Sys., LLC*, 842 F.Supp.2d 502, 514, 2012 WL 209110, at *8 (S.D.N.Y.2012) (internal quotation marks omitted).

█ The fact that Dodona did not purchase the Hudson 1 securities directly from Defendants is not sufficient to defeat an unjust enrichment claim at the motion to dismiss phase, especially when, as here, the Complaint shows that the timing of the Hudson 1 offering and Dodona's purchase were so closely aligned and only one intermediate party separated GS & Co and Dodona. *See State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F.Supp.2d 94, 102 (E.D.N.Y.2010) (To establish unjust enrichment, "[t]he benefit to the defendant ... can be either direct or indirect."); *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 778 N.Y.S.2d 147, 149 (1st Dep't 2004).

And although there is some indication in the Offering Circulars that those who purchased the Hudson CDO securities would be required to do so pursuant to written agreements, the Complaint contains no allegations regarding any written contract. While the Court anticipates that a contract will materialize during discovery, at this stage of the proceedings, Dodona has properly pled unjust enrichment.

## IV. *CONCLUSION*

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that the Motion (Docket No. 48) of defendants Goldman, Sachs & Co., The Goldman Sachs Group, Inc., Peter L. Ostrem, and Darryl K. Herrik to Dismiss the Amended Complaint is **GRANTED** in part and **DENIED** in part, in accordance with this Decision and Order; and it is further

**ORDERED** that the Motion (Docket No. 53) of defendants Hudson Mezzanine Funding 2006–2, Corp. and Hudson Mezzanine Funding 2006–2, Ltd. to Dismiss the Amended Class Action Complaint is **GRANTED** in part and **DENIED** in part, in accordance with this Decision and Order.

**SO ORDERED.**